# HOYT *v.* LATHAM.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE
DISTRICT OF MINNESOTA.

No. 173.   Argued January 28, 29, 1892. — Decided February 29, 1892.

While it is true that a trustee cannot legally purchase on his own account
that which his duty requires him to sell on account of his *cestui que trust*,
nor purchase on account of the *cestui que trust* that which he sells on his
own account, and that the *cestui que trust* may avoid such a sale even
though made without fraud, and without injury to his interests, yet it is
also true that such a transaction is not absolutely void in the sense that
the purchaser takes no title, and that it may be ratified and affirmed by
the *cestui que trust*, either directly or by acquiescence and silent ap-
proval; and, in such case, when he has ample notice of the facts, and
waits before taking action to set the sale aside until he can see whether
the transaction is like to prove a profitable speculation, he is guilty of
laches, which amount to a ratification and approval.

*Hammond* v. *Hopkins, ante,* 224, cited and followed.

THE court stated the case as follows:

This was a bill filed by William H. and Edward P. Latham,
who are heirs and owners of two-ninths of the estate of their
brother Charles F. Latham, against Ashbel H. Barney and his
associates to compel an accounting for the proceeds of the
sale of an undivided one thirty-seventh interest in certain
lands belonging to the estate of the said Latham, and for a
decree adjudging the plaintiffs to be the owners of two-ninths
of his interest in the unsold lands, and for a conveyance of the
same.   The suit arose upon the following state of facts:

On the 31st day of October, 1867, a contract was executed
between Alfred M. Hoyt, Danford N. Barney, Ashbel H. Bar-
ney, Charles F. Latham and five other associates, of the first
part, and the Winona and St. Peter Railroad Company of the
second part, by which, after reciting that the parties of the
first part had loaned and advanced to the corporation large
sums of money, and had constructed and equipped 105 miles
of its railroad in Minnesota, whereby the corporation had

become indebted to them in a large sum of money, it was provided that certain payments should be made upon that indebtedness by the issue to them of stock and bonds, and that a portion of a Congressional land grant owned by the railroad company should be conveyed in satisfaction of the residue. The land so to be conveyed was as many acres theretofore granted by Congress as the corporation should receive by reason of the construction of such road for a distance of 105 miles westerly from Winona, reserving the right of way and depot grounds. The lands were to be conveyed to the parties of the first part, as they should direct, whenever, and as soon as, the railroad company had obtained title thereto under the acts of Congress. Instead of taking a conveyance of the lands the parties interested elected to take the proceeds of their sales, as they were permitted by the contract to do, and therefore, as they were sold by the railroad company, the proceeds were from time to time paid over to them. The number of acres to which the company was entitled was ascertained by judicial decree to be 514,266 and a fraction.

Charles F. Latham, one of the parties to this contract, and entitled to one thirty-seventh of these lands or their proceeds, died intestate, August 25, 1870, leaving as his only heirs or next of kin nine brothers and sisters, and the children of a deceased sister; and, up to the execution of the agreement hereinafter referred to, his share of such proceeds was deposited in bank to the credit of his estate. One of his sisters had received her share of his estate in advance, and it is conceded that the estate vested in eight brothers and sisters and the children of the deceased sister, each being entitled to an undivided one-ninth of his one thirty-seventh interest. The plaintiffs are two of the brothers, and each became entitled at his death to a one-ninth interest. No legal proceedings were taken for the settlement and distribution of his estate; no administrator was ever appointed, but in accordance with a wish expressed shortly before his death, and for the purpose of saving the expenses of administration, the defendant Ashbel H. Barney took possession of the assets of the estate, and proceeded to distribute them. The estate, exclusive of the inter-

est in the land grant, amounted to $177,962.48, and was substantially all personal property. The defendant Barney held an interest of his own in the land grant, as one of the parties who contracted with the railroad company. Shortly after the death of Mr. Latham, two of his sisters and their husbands orally assented to a sale by the defendant Barney of the interest of the estate in the land contract, for the sum of $10,000, he at that time advising them that it was worth no more.

It does not appear that any of the other heirs were consulted as to this disposition of the interest in the land. Some time prior to the 9th of September, 1871, the defendant Barney entered into an agreement to sell the interest of the estate in these lands for $10,000 to the eight persons, who, with Latham, had by such contract purchased the same from the railroad company, Mr. Barney himself being one of such persons.

At or about this time the defendant Barney caused to be prepared a statement of account between himself and the estate, and a release to be signed by each of the heirs. One copy of this statement was prepared for each of the heirs, and one for Mr. Barney, and they were all sent together to each heir to be signed, and after they were signed, one executed copy was sent to each. One of the copies of this statement and release differed from the others in one particular, hereinafter stated, and all but that one read as follows:

"Whereas Charles F. Latham, late of Irvington, county of Westchester, and State of New York, died intestate, leaving a considerable estate, consisting of personal property, to be distributed among his next of kin, the said Latham having survived his wife and parents and leaving no children or representatives of a child;

"And whereas the next of kin of said Latham entitled to participate in the distribution of said estate, for the purpose of saving the delay and expense incident to legal proceedings to effect such distribution, have agreed among themselves as to the division of said estate, and the amount going to and receivable by each of the said next of kin, whether in money, stock, bonds or other property;

"And whereas the persons entitled to participate in such distribution and who have agreed upon the same, are the following."

Here follow the names and residences of the next of kin, a recital of the advancement to one of the sisters, and a release by her of her interest in the estate to her brothers and sisters; releases by each of the heirs to the others of all claim and demand against the estate; a recital that Barney had in his possession certain of the assets and property of the deceased, which he had surrendered and delivered to the next of kin; and an agreement "that the said parties hereto, in consideration of the premises and of the surrender and delivery to the said next of kin of the aforesaid property and assets, have and each of them hath released . . . and each of them do . . . release, and forever discharge the said Ashbel H. Barney . . . of and from all claims, demands, actions and causes of action on account of the said assets and property of the said Charles F. Latham so in his possession or under his control. In witness whereof," etc.

This was signed by all of the heirs, including the plaintiffs, and a schedule was attached "showing the estate of which the late Charles F. Latham died possessed, and the distribution among the next of kin, in the foregoing agreement mentioned." This estate consisted almost wholly of cash, shares in corporations, bonds and coupons, and other personal property, with the following exception: "Int. in W. & St. P. lands, estimated $10,000." Of the eleven releases the one sent to Edward P. Latham accidentally differed from the others in using, instead of the words above cited, the words, "Interest in W. & St. P. land sales, say $10,000." About January 1, 1872, defendant Barney enclosed to each distributee, with the release and a supplemental statement of the assets, not material here, a check for his or her share of the estate, which was received and retained by each.

Plaintiffs in December, 1876, brought this action upon the ground that the foregoing proceedings and the release executed by them did not divest them of their interest in the lands. The Circuit Court rendered a decree in favor of the

plaintiffs, in accordance with the prayer of their bill, both for a money recovery and for an account of the proceeds of such lands as should be subsequently sold. 4 McCrary, 587. From this decree an appeal was taken to this court.

*Mr. Thomas Wilson* (with whom was *Mr. Lloyd W. Bowers* on the brief) for appellants.

*Mr. C. K. Davis* (with whom was *Mr. Owen Morris* on the brief) for appellees.

There is no conflict of testimony on any material point.

The opinion of the Circuit Court disposes of all the assignments of error upon grounds which we insist are unassailable. It is based upon the decision of this court in *Michoud* v. *Girod*, 4 How. 503. That decision settles the law and equity of this case so clearly that there is little necessity for comment, and no necessity for the citation of cumulative authorities.

Mr. Barney should be held to duties and disabilities of an executor in this transaction. He was an executor *de son tort*. 2 Bl. Com. 507; Schouler on Executors, § 184.

Had Mr. Barney attempted to acquire this property in the manner the Girods adopted, as stated in *Michoud* v. *Girod*, at public sale, judicially ordered, the title thus acquired would have been set aside. The method he pursued was more reprehensible. It made him a trustee and imposed upon him the extreme obligation and disabilities prescribed in *Michoud* v. *Girod*. See *Rothwell* v. *Dewees*, 2 Black, 613; *Graffam* v. *Burgess*, 117 U. S. 180, 192.

To the contention that the complainants should have returned the money that they had received before bringing this action, there are several answers. No such ground of defence is assumed by the appellants. They deny entirely the right of the Lathams, and insist that by a perfect and complete transaction, they have in equity parted with all interest in these lands. In case of such a denial of right, a tender is not necessary, but the amount received by the complainants will be taken into account at the hearing and provided for in the

decree; and this was done in this case. *Potter* v. *Taggart*, 54 Wisconsin, 395; *Baumann* v. *Pinckney*, 118 N. Y. 604.

The complainants have not ratified this contract by acquiescing in it, or by any act of confirmation. Their requests of Mr. Barney for a settlement and all of their negotiations with him, futile as they were, were based upon a distinct assertion of the invalidity of the transactions as to the lands.

MR. JUSTICE BROWN delivered the opinion of the court.

This case depends upon the validity of the sale made by the defendant Barney to himself and his associates of the interest of Charles F. Latham in the lands granted in aid of the construction of the Winona and St. Peter Railroad Company, and the binding effect of the releases executed by the plaintiffs and the other heirs of Latham. This sale is attacked upon the ground that it was made by Barney, as trustee for the heirs, to himself and his cocontractors in the construction of the road, and for a grossly inadequate price.

It seems that a few days before the death of Mr. Latham he had an interview with the defendant Barney, in whom he had perfect confidence, and requested him to make a distribution of a part of his property to certain beneficiaries, and to divide the residue among his brothers and sisters and their children. In the early part of 1871, Danford N. Barney, of New York, a member of the syndicate which had constructed the road, and Judge Kelly, of Cleveland, each of whom had married a sister of Latham, met with their wives at Irvington, N.Y., called in the defendant Ashbel H. Barney, and requested him to make a distribution of the estate for the purpose of saving time and expenses. The value of Latham's interest in the land grant was the principal subject of discussion. To quote Barney's own words: "I stated to them that it was very difficult, indeed, to fix an accurate value for that property; there were so many contingencies that might affect its value. They seemed to be very anxious, indeed, as to making a settlement without the intervention of the probate court. . . . They asked me to say what I thought it was worth, not stating the

facts, as I generally understood them at the time. I stated to them that I thought the property ought to be worth $10,000; that if we got all the land that was due to us it would be worth perhaps more than that, but with the uncertainty of getting what we hoped to get that I considered that a fair price for the property, and they all agreed to accept of that, and desired me to make a division of the estate accordingly, which I did." Shortly after this he offered the property to Mr. Sykes, vice-president of the Chicago & Northwestern Railroad, at that price, knowing that he was familiar with the value of the property, but he would not consent to take it. He then offered it to his cocontractors, but they did not at first care to take it. "I said to them it was very important to make this sale, and they said they did not care to have a stranger come in who might not agree with us in the enterprise — might not furnish money for the construction of the road — and various other objections were brought up; and then Mr. Fargo and Mr. Cheney said: 'If you think the property is worth it we will take it.' . . . There was not a man but what objected to taking it at first, except my brother, who knew all about it." With reference to its value, he states as his opinion, and there is nothing in the case to contradict it, "that it could not have been sold to any other party, and I think the interest was taken as a matter of convenience, so as not to bring in any additional new element in the business, and not for any profit out of this particular transaction." There were, it seems, several circumstances which tended materially to impair the value of the land, and in fact to render it at that time unsalable. The Transit Railroad Company, to whose franchise and property the Winona and St. Peter Railroad Company succeeded, had received a loan of the credit of the State to the amount of $500,000 or over, for which it had given its bonds, secured by a mortgage upon its lands and franchises; and it was claimed that these lands were liable for this debt, and at the time of these negotiations this question was pending in the Circuit Court for the District of Minnesota and was subsequently settled in this court. *Hopkins* v. *St. Paul & Pacific Railroad,* 2 Dillon, 396; *Chamberlain* v. *St. Paul & Sioux*

*City Railroad,* 92 U. S. 299. There were also certain disputes with regard to the title to these lands and to their taxation, which afterwards culminated in a protracted litigation, the pendency of which for a long time seriously impaired the market value of the property.

Acting in pursuance of the authority given at the meeting in Irvington, Barney prepared a form of release and schedule of the assets, which consisted almost entirely of stocks, bonds and coupons, and included the item of $10,000 for the interest in these lands, the assets amounting in all to $187,962.48.

Eleven copies were sent to each of the heirs for their signatures, and were subsequently returned to him, and one copy sent to each with a check for his share of the estate, which was received and retained by each without objection. The copy sent to Edward P. Latham differed from the others in using, instead of the words "Int. in W. & St. P. lands, estimated, $10,000," the words "Interest in W. & St. P. land sales, say $10,000."

So far as Edward P. Latham was concerned, the transaction was closed on January 10, 1872, by Barney sending him his copy of the release and schedule, with a supplementary statement and a draft of $9480.89 to close the account. A similar statement was sent to William H. Latham with a check for $13,993.39. No objection was made to this until August 26, of the same year, when Edward P. Latham wrote Barney briefly, calling his attention to the item of $10,000 for interest in W. & St. P. land sales, and saying that he understood this as the sales made up to that date as made by the company in the usual sales, and by no means the sales of all lands not yet sold; to which Mr. Barney replied, under date of September 11, that Judge Kelly fully understood, when the settlement was made, that it included the payment in full of the heirs' interest in the Winona lands, and that it was fully so stated in the release. "The legislature will, no doubt, this winter order the lands to be opened for taxation. . . . Taxation would make them valueless, almost. . . . There has been no transfer, and I know they" (the purchasers) "don't care for it, and I certainly do not, neither does D. N. We would

both like to sell out, as our interest in the grant is but little value to us except in the good will we may have for our grandchildren." He closed his letter with an offer to surrender to the heirs their entire interest in the lands upon being refunded the $10,000 already divided, and with a request for a decision at once, "as it should not remain an open question." To this Latham replied under date of November 19, saying that, after consultation with some of the heirs, he had decided, with their advice and coöperation, to accept the offer. "You may, therefore," said he, "from this date, consider the $\frac{1}{32}$ part interest" (meaning $\frac{1}{37}$ part) "of the lands in question mine and proceed to make the necessary legal transfer. The money, $10,000, will be ready at an early date." Barney replied under date of November 30, expressing his pleasure that the heirs had concluded to take the interests in the lands to themselves, and saying that it could not be sold to other parties than those now owning ³⁶ of the interest. "Should they buy it they might be charged with misrepresentation should the purchase prove profitable. Should it not prove a good investment for the heirs, none will be able to say that they ' went in blind.'" To this Latham replied, under date of December 26, saying that he supposed the moneys accrued upon sales made since the division and estimate will be deducted from the $10,000; asking the amount to be refunded, and saying that he had it in his hands, and would forward it as soon as the parties could come to an understanding of how and when the transfer should be made. Barney replied, January 2, 1873, that the parties had no title to the lands, the title being in the railroad company, and suggesting that he make a contract for the purchase from each individual heir, and saying that since the division of the estate $1265.38 had been collected. Again he wrote him on January 13, saying that he was not in a position to give him title to any interest in the lands owing to the fact that it was still in the railroad company, and suggesting as follows: " I see no way for you to get an interest in the property other than your legal share, except by contract with each heir, and then file said contract with me, and I will make the distribution of the proceeds of

the sales the same as I do all others holding the original interest." The affair remained in this condition for more than two years, when Barney, being informed that all objections to the sale had been withdrawn, remitted him, under date of April 16, 1875, a final statement with explanations and a check for $298.33 to close the estate. This check was acknowledged and retained, though he declined to give a receipt. No further correspondence passed between these parties, until December of that year.

In the meantime, however, and on January 30, 1873, William H. Latham wrote to Mr. Barney that he had been in communication with his brother Edward; had seen Mr. Barney's last letters to him, and was glad he was willing to give up to him, and such others of the heirs as desired their share of the proceeds of these sales, upon being reimbursed the $10,000 paid, and saying that six, if not more, of the heirs were willing to make this arrangement, and that if he had known anything whatever of these lands he would have been unwilling to sign away his interest for one-ninth of $10,000. This letter was partly, at least, in reply to Mr. Barney's letter to Mr. Edward P. Latham of January 13. To this Barney replied, under date of February 10, protesting that the parties had no title to the lands, and offering to make a distribution of all the money in his hands for lands sold since the date of the final distribution, upon being refunded the $10,000, and offering to continue to make such distribution as long as he continued to be the agent of the party now having an interest in the proceeds of the lands. Again he wrote him under date of April 4, saying that the $10,000 had been promised last December by his brother Edward, and that it was due to the parties that advanced it that it should be at once refunded. Receiving no answer to this, he wrote him again, May 13, to the same effect, saying that there were important suits being threatened, which, if successful, would take from them a portion of the lands, and saying that the purchasers were perfectly willing that the heirs should have their interest returned to them, provided a decision were made, "within say thirty days from this date; but they are not willing to pay for the prop-

erty and have you hold the right at any future time to elect to return the money for the purchase and take the interest. They have now held the matter open for six months." To this Latham replied, May 19, by a somewhat evasive letter, saying that he had been ready to pay his proportion; but, as Barney required the assent of all the heirs before relinquishing the lands as a whole or any portion, he had dismissed the whole thing from his mind as impracticable. He closed by saying that perhaps his brother had acted hastily and injudiciously, and he had written and urged him to immediate decisive action.

On June 19, Mr. Barney wrote again, protesting that none of the parties desired to make a great bargain out of the estate; that the settlement was made to avoid expense; that the time had passed which he had named for the heirs to avail themselves of the privilege of taking their proportion of the lands; but, that there might be no cause for complaint, he would again open the matter for a thirty days' option for one or all of the heirs. "If," says he, "the heirs do not take the interest I am compelled under my agreement to become one of the purchasers; that being the case I wish to rid myself of the ugly position of being a seller and a purchaser. I would not for thrice the value of the property have the ill will of the heirs."

It seems that at this time a controversy had arisen between the Winona and St. Peter Railroad Company and the St. Paul and Sioux City Railroad, which was pending before the Secretary of the Interior, and had been decided alternatively in favor of each party, and was subsequently carried into the courts. There was also a claim pending in favor of one Drake for a three-eighths interest in all the stock, lands and other property of the defendant; and another by one Kirk, who claimed one-fourth of the property, franchises, stock and profits of the defendants, which culminated in a suit in the following October.

The State had also made a claim for taxes upon these lands, and it was then believed that these taxes, if enforced, would render them nearly valueless.

No reply was made to Barney's letter of June 19, 1873, and all correspondence between these parties with respect to these lands ceased for a time, although during the year 1874 a number of friendly letters were exchanged between W. H. Latham and himself with reference to some United States Express stock, but no allusion was made to the lands. On February 15, 1875, Mr. Barney remitted William H. Latham a statement and check for $298.34 due him as heir of the estate.

On March 27 Latham reopened the correspondence by stating his reluctance to give up his interest in the lands, having never been fully informed as to their status, and desiring to know how many acres they were entitled to, and how many had been sold, etc. To this Mr. Barney replied, calling his attention to the offer he had made, and asking him if he were not satisfied, to let him know what he desired, and saying that the Drake suit would be tried in June, and that the tax suits would probably be decided against them. On April 26 he wrote him a very full letter, saying that he had given the heirs the option to take their proportion of the proceeds of the land, and three times extended this option, and continued the same until September, 1873, "when my brother said he had talked with you about it, and you were satisfied," and giving considerable information with regard to the number of acres claimed by them, the number sold, and probabilities with respect to the pending suits, etc. To this Mr. Latham replied in a short note, April 29, acknowledging receipt of a statement and check enclosed in his letter, and saying that the whole matter appeared satisfactory as far as a cursory examination would indicate. "I am obliged to you for the evident effort made to satisfy me and will write more fully in a few days." On the same day Mr. Barney wrote him from New York, saying that the decision of the full bench on the question of taxation had been adverse; that the suit had been promoted by his brother, and that $40,000 a year would not pay their taxes.

No other correspondence took place until December 17, 1875, when the plaintiffs wrote a joint letter, saying that each of them would pay one-ninth of the $10,000, "paid by yourself,

directly or indirectly, for proceeds of sales of lands made since January 1, 1872, or for receipts of sales made anterior to that date." Owing apparently to the pressure of business engagements, Barney did not reply to this until March 1, 1876, wherein he rehearsed at length what had been done, and protested that it would not be fair, after having taken all the risk of making the property valuable, for the plaintiffs to demand their proportion back again, "now that we have been in the main successful." He closed by declining to comply with their request for the two-ninths interest in the lands. In reply, Mr. Latham wrote him, March 23, a long letter stating his reasons why he should not be bound by what had been done, and renewing his proposal to take his interest and pay the corresponding proportion of the $10,000. This letter is certainly a very cogent statement of the position from his standpoint. To this and another letter, not produced, Barney replied under date of April 24, presenting also a full statement of facts, urging the injustice of his claim, and offering still to give him and his brother two-ninths of one thirty-seventh interest in the Winona and St. Peter Land Company, formed by the former associates, who took the same proportional interests in the new company they held before it was organized, for two-ninths of $10,000. (This company was organized in 1876 by the defendant Barney and his associates, and had taken the title to all these lands from the railroad company.) This offer was declined by Mr. Latham, and the correspondence was closed by a letter of Mr. Barney, August 1, 1876, saying that he would have transferred to the plaintiffs one-ninth of one thirty-seventh of the stock of the new land company, carrying dividends from its organization for all receipts for lands sold and to be sold since its organization. "The difference between what you ask and my offer would not pay the lawyers' fees for prosecuting or defending a suit brought to seek what you ask for."

This entire correspondence, which is very voluminous, was characterized by the most courteous language; with an evident desire on the part of each to take no unfair advantage of the other, but with a failure to agree upon what, under the

circumstances, justice and equity demanded. It really constitutes in itself nearly all the facts pertinent to the case. It certainly exhibits on the part of Mr. Barney a desire to deal fairly with the plaintiffs, and a vacillation on their part, which has a strong tendency to show that before making up their minds to accept his offer to refund the $10,000, and take the proceeds of the sales of the lands, they intended to wait and see whether it would prove a successful speculation. We have no desire to weaken or qualify in any way the wholesome doctrine laid down by this court in the case of *Michoud* v. *Girod*, 4 How. 503, that a trustee cannot legally purchase on his own account that which his duty requires him to sell on account of another, nor purchase on account of another that which he sells upon his own account — in other words, he cannot unite the two opposite characters of buyer and seller. So jealous is the law of dealings of this character by persons holding confidential relations to each other, that the *cestui que trust* may avoid the transaction, even though the sale was without fraud, the property sold for its full value, and no actual injury to his interests be proven. It does not follow, however, that the sale is absolutely void in the sense that the purchaser takes no title, which he can convey to a third person — a *bona fide* purchaser without notice; nor that the *cestui que trust* may not, upon notice of all the facts, ratify and affirm the sale by his acquiescence or silent approval. Thus in *Marsh* v. *Whitmore*, 21 Wall. 178, 183, 184, where an attorney sold bonds of a client at a public sale, and bought them in himself, at their full value at the time, and the client was aware of the purchase and acquiesced in it for twelve years, it was held to be too late for him to attempt to impeach the validity of the sale. "Most undoubtedly," said the court, "that sale was voidable. The character of vendor and that of purchaser cannot be held by the same person. They impose different obligations. Their union in the same person would at once raise a conflict between interest and duty, and, constituted as humanity is, in the majority of cases duty would be overborne in the struggle. . . . The complainant could have treated the purchase made by the defendant as a

nullity. . . . But unfortunately for him there is more in the case. He has adopted and approved of the transaction. . . . Had he at once denied the validity of the transaction, or by any declaration or proceeding indicated dissatisfaction with it, or even refrained from expressions of approval, he would have stood in a court of equity in a very different position."

So in *Twin Lick Oil Company* v. *Marbury,* 91 U. S. 587, it is said that the right of a corporation to avoid the sale of its property by reason of the fiduciary relations of the purchaser must be exercised within a reasonable time after the facts connected therewith are made known, or can by due diligence be ascertained, and that the determination of what is such reasonable time must be arrived at by a consideration of all the elements which affect that question.

In *Hayward* v. *National Bank,* 96 U. S. 611, a bank sold collaterals to three of its own directors, and applied the proceeds to the payment of a loan. The debtor, who was advised of the sale, and that enough had been realized to pay his indebtedness, made no objection; but nearly four years after the sale, the stocks having in the meantime greatly increased in value, notified the bank of his desire and purpose to redeem them; but on his subsequently filing a bill for that purpose, he was held not entitled to relief. To the same effect are *Grymes* v. *Sanders,* 93 U. S. 55, 62; *Pence* v. *Langdon,* 99 U. S. 578, 581; *Mackall* v. *Casilear,* 137 U. S. 556, 566. In cases of actual fraud or of want of knowledge of the facts, the law is very tolerant of delay; but where the circumstances of the case negative this idea, and the transaction is sought to be impeached only by reason of the confidential relations between the parties, and the *cestuis que trust* have ample notice of the facts, they ought not to wait and make their action in setting aside the sale dependent upon the question whether it is likely to prove a profitable speculation. As the question whether the sale should be vacated or not depends upon the facts as they existed at the time of the sale, so in taking proceedings to avoid such sale, the plaintiff should act upon his information as to such facts, and not delay for the purpose of ascer-

taining whether he is likely to be benefited by a rise in the property, since that would practically amount to throwing upon the purchaser any losses he might sustain by a fall, and denying him the benefit of a possible rise. *Hammond* v. *Hopkins; ante*, 224.

This is not an ordinary case of a trustee buying the property of his *cestui que trust* for the purpose of gain. The deceased was associated with eight others in the construction of a railroad; they were to be paid in part, at least, by these lands or their proceeds. At Latham's death he left a large amount of property, of which his interest in these lands was but a small fraction, estimated at about one-eighteenth. At his request and that of two of the heirs, the defendant Barney undertook the settlement of the estate for the purpose of saving the expense of administration. Had Latham been alive and desirous of disposing of his interest in these lands, his first thought would have been to offer such interest to his associates, who, already owning thirty-six thirty-sevenths, could well afford to buy this trifling interest, and, naturally desiring to prevent a stranger from entering the syndicate, would be likely to pay as much or more for it than any one else. Failing to find a purchaser in Mr. Sykes, Barney offered it to the syndicate. He could not himself have expected to realize much by the transaction, since his interest was only an eighth of the whole purchase, which was itself only one thirty-seventh of the entire grant. There was no attempt on his part to conceal the real transaction, or to disguise the fact that he was one of the purchasers. By making the sale he was enabled to effect a distribution of the estate without delay. This he proceeded to do by sending to each heir a statement of his account and a check for his or her share of the proceeds, demanding at the same time a release from further liability.

Apparently so little was thought of this interest in the lands that the release itself spoke only of "personal property, to be divided among his next of kin, . . . whether in money, bonds, stock or other property." In short, his interest in these lands was treated as a mere incident to the personal estate, and unworthy of a separate consideration. It was

thought, and properly so, that it should be disposed of at once in order to secure a speedy settlement of the estate; if put up at auction, it would probably have proven unsalable.

There is absolutely nothing tending to show fraud or bad faith on the part of the defendant Barney; indeed, we are not satisfied that this not was the most prudent disposition to make of this interest, in view of the uncertainty regarding the title and value of this property. While the law pronounces a sale of this kind voidable at the election of the *cestui qui trust*, there was every reason for demanding prompt action upon their part in disaffirming it. Barney himself recognized the right of the plaintiffs to set aside the sale; gave them apparently a satisfactory statement of the facts, requesting only that a decision should be made at once, as it should not remain an open question. (September 11, 1872.) Nothing decisive having been done, he wrote W. H. Latham again, May 13, 1873, giving him the option of rescinding the sale if action were taken within thirty days, which was again extended by his letter of June 19. Nothing was done for nearly two years, when Latham reopened the correspondence by asking further particulars. Another correspondence of a year then ensued, the property in the meantime apparently having come into the market and largely increased in value. In view of the lapse of time, the organization of a new company and the change of circumstances, Mr. Barney was apparently unwilling to renew his first proposition, but submitted a new one, or rather a modification of the first, which the plaintiffs declined to consider, and in December, 1876, filed this bill. In the meantime Danford N. Barney and Judge Kelly, the two most material witnesses, who acted for the other heirs and advised the sale, have both died, and the parties have lost the benefit of their testimony.

Under the circumstances, we think the plaintiffs should have taken immediate action; they were fully informed of the facts of the transaction, or at least they were informed of enough to put upon them the necessity for further inquiry, and they must have known that delay, even for a year or two, might work a very great change in the value of their brother's

interest. If the syndicate were successful in their litigation with respect to these lands, they would undoubtedly largely increase in value; upon the other hand, if they were unsuccessful, the interest might be comparatively worthless. No explanation is given for their delay, and none is suggested except an apparent intention to wait and see what the value of these lands was likely to become, and whether it would prove more profitable to set aside the sale or let it stand. While the delay in this case was not a long one, measured simply by the time which elapsed after the sale was made, we think, under the circumstances, it amounted to a ratification of such sale, and that the bill should have been dismissed.

The decree of the court below is therefore

*Reversed, and the case remanded with directions to dismiss the bill with costs.*

MR. JUSTICE FIELD dissented.

MR. JUSTICE BREWER did not sit upon the argument of this case, and took no part in its decision.