NOBLE GOLD MINES COMPANY, A CORPORATION, APPELLANT, v. R. C. OLSEN, L. J. OLSEN, HAZEL RICKETTS AND VERNE RICKETTS, HER HUSBAND, RESPONDENTS.

No. 3159

April 5, 1937.                    66 P. (2d) 1005.

*Clarence L. Young,* for Appellant:

*W. A. Wilson* and *H. J. Murrish,* for Respondents:

**OPINION**

By the Court, TABER, J.:

This cause comes here on appeal from a judgment of the Sixth judicial district court, Pershing County, and from an order of said district court denying a motion for new trial. Appellant was plaintiff in the court below. The action was brought to quiet its title to the northeast quarter of the northeast quarter of section 15, township 33 north, range 30 east, Mount Diablo base and meridian; also an irregular parcel of land described as follows: Beginning at the southeast corner No. 6 of the North Star lode mining claim in Scossa mining district, Pershing County, Nevada, and running thence north 16° 44′ east 648 feet, more or less, to the section line between section 10 and 15 of township 33 north, range 30 east, M. D. B. & M.; thence in an easterly direction 74 feet, more or less, along the north boundary line of section 15 to the northeast corner of the northwest quarter of the northeast quarter of section 15, township 33 north, range 30 east, M. D. B. & M.; thence south

along the east side line of said northwest quarter of the northeast quarter of said section 15, 620 feet, more or less, to a point; thence west and parallel to the north boundary line of said section 15, 265 feet, more or less, to corner No. 6 of North Star lode mining claim, the point or place of beginning, situated in Scossa mining district, Pershing County, Nevada.

The original official government survey of the lands in the vicinity of the above-described property was made in 1875. In 1903 said section 15, as nonmineral land, was patented to the Central Pacific Railroad Company. By deed dated February 4, 1931, the Southern Pacific Land Company conveyed to George B. Noble, now president of plaintiff corporation, the northeast quarter of the northeast quarter of said section 15. On February 23, 1933, said George B. Noble deeded said subdivision to plaintiff.

The Scossa mining district was organized in 1930, and the Scossa brothers, Charles and James, after whom the new mining camp was named, located the North Star lode mining claim. On the 2d day of July 1931, the Scossas deeded to said George B. Noble the irregular piece of land hereinbefore described. Said George B. Noble, in turn, deeded said irregular tract to plaintiff February 23, 1933.

On December 11, 1930, defendant R. C. Olsen, and his father, J. P. Olsen, located the Hawk Eye lode mining claim just east of said North Star claim. On March 27, 1931, defendant R. C. Olsen and E. F. Laughton located the Belcher lode mining claim a short distance easterly from said Hawk Eye claim. All the essentials of both federal and Nevada laws were complied with to make said Hawk Eye claim valid, except that, as contended by plaintiff, the point of discovery, location monument, location work, annual labor and all other work done on said claim were on patented land owned at the time of its location by the Central Pacific Railroad Company and, at the time this suit was brought, by plaintiff corporation.

No government survey monuments were found in the immediate vicinity of any of the above-named mining claims at or about the time of their location, so the interested parties could not without a new survey know where the section lines were as originally established by the government, nor on what sections or subdivisions their claims were located. A survey was made in February 1931 by Carl Stoddard and Kerby Stoddard, who were originally employed to make the survey by Martin Goni and Herbert Hamlin. It is admitted that George B. Noble was interested in the hiring of the Stoddards to make this survey and that he contributed $50 towards its costs. One of the chief purposes of the Stoddard survey was to locate the boundary line between sections 10 and 15 in said township. This boundary line, as located by said survey, will henceforth be referred to as the Stoddard line. It cut across and approximately bisected the shaft then being sunk by Mr. Noble in ground believed by him to be within the exterior boundaries of his said railroad subdivision.

Since the Stoddard survey, it has at all times been admitted that a portion of the Hawk Eye claim, as originally marked on the ground, extends to the south across the boundary line between said sections 10 and 15 and onto the said northeast quarter of the northeast quarter of section 15, the subdivision owned by plaintiff. According to this survey, the discovery point and location monument of the Hawk Eye claim are, and all work done by defendants has been, north of the Stoddard line. Defendants, since said survey, have never claimed any ground south of that line, and plaintiff admits that they have not at any time done any work there.

The boundary line between said sections 10 and 15 has been located in at least three other places than that established by the Stoddard survey. In January, or early in February 1931, Tom Mack, employed by the corporation which sold said 40-acre subdivision to Mr. Noble, located the boundary line between said sections

about 200 feet south of the Stoddard line. John G. Huntington, whose qualifications as a surveyor were admitted by defendants just as Carl Stoddard's qualifications were admitted by plaintiff, made a survey in the summer of 1935 and first located said boundary line about 260 feet north of the Stoddard line, later establishing it approximately 200 feet north thereof. According to Mr. Huntington's survey, the discovery point and location monument of the Hawk Eye claim are, and practically all work done by defendants has been, south of the boundary line between said sections 10 and 15. Upon the basis of the Huntington survey, plaintiff, on August 2, 1935, served written notice on defendants that their shaft and principal workings were located within the boundaries of plaintiff's patented land, and requesting them to evacuate the property of which they were in possession. Defendants having failed to comply with said notice, plaintiff commenced this action on the 11th day of August 1935.

The defense was based on two contentions: First, that the Stoddard line is the true boundary line between sections 10 and 15; and, second, that were it to be conceded that the preponderance of evidence favors the Huntington survey, plaintiff is estopped, as to the defendants, on the issues made in this case, from asserting that the Stoddard line is not the boundary line between said sections. By way of cross-complaint, defendants alleged their ownership, subject to the paramount title of the United States, in the Hawk Eye claim, and prayed the court to quiet their title thereto. The trial court did not make any finding, based on the surveys alone, determining the true boundary line between said sections 10 and 15. It based its decision squarely upon the ground that plaintiff was estopped from maintaining its suit and from denying that the Stoddard line is the dividing line between its property and that of defendants.

Following, in substance, is the evidence chiefly relied

upon by defendants in support of their plea of estoppel:

Plaintiff and Mr. Noble, knowing of defendants' location of the Hawk Eye claim from the beginning, knowing also of the expense being incurred and work being done by defendants, took no steps to dispossess them for more than 4½ years after said claim was located, nor until, through their efforts and the outlay of approximately $10,000, it had produced about $8,000 in ore values and had become a paying proposition. Mr. Noble has lived at Scossa since some time in 1930, and he and plaintiff, ever since that time, have operated mining properties in immediate proximity to the Hawk Eye claim.

Defendants further point out that in the deed from the Scossas to Mr. Noble, Mr. Noble's deed to plaintiff, and in plaintiff's complaint, the first course in the description of the irregular tract of land hereinbefore mentioned begins at the southeast corner of the North Star claim and runs thence north 16° 44′ east 648 feet, more or less, to the section line between said sections 10 and 15. W. A. Pray, a qualified surveyor employed by defendants after this action was commenced, measured said course from said corner of the North Star claim to the Stoddard line and found the distance to be approximately the same as that given in said deeds and complaint, to wit, 650.8 feet, showing clearly, as defendants contend, that the Stoddard line was regarded by the parties to said deeds as the boundary line between said sections, and that the second course in the description of said irregular tract, being the north boundary thereof, was intended to run easterly along said Stoddard line.

Before accepting the Scossa deed, Mr. Noble caused a survey to be made of the irregular tract by Mr. Frank O'Leary, a civil engineer, for the purpose of assuring a correct description.

The Stoddard line has been accepted by defendants ever since it was located. After the Stoddard survey,

defendants did not at any time attempt to take possession of or do any work on any ground south of the Stoddard line.

Edward M. Ranson, locomotive fireman residing at Imlay, Nevada, and co-owner, with R. Nenzel, of the Belcher claim, testified that in 1933 and 1934 he was employed at Scossa as foreman at the Red Top mine for the American Milling & Mining Company and as a miner at the Great Hope mine. In February 1934, according to Mr. Ranson, he had a conversation with Mr. George B. Noble regarding the ownership of the Hawk Eye claim. In this conversation Mr. Noble said it was his ground, and when asked by Mr. Ranson why he did not put the defendants off the property, replied that as long as they were just making a living he would let them go—would not bother them.

R. Nenzel, above referred to, testified that he was at the camp of Scossa in 1933 and 1934 in the capacity of secretary of the American Milling & Mining Company, and that he was also operating the Belcher claim. Asked if he had had any business dealings with Mr. Noble and as to the nature of any such dealings, Mr. Nenzel replied: "Well, when I bought this claim from the Olsens I hired Mr. Carl Stoddard to come out and survey, so I knew where my boundaries were, and he surveyed, went right across a shaft of Gus Warmouth's, which property had been leased to Gus Warmouth by Mr. Noble, and Mr. Noble asked me what I was going to do about it. I asked him to do about what? He said, well, you going to make Mr. Gus Warmouth quit working here? I said, no, I will deed him 10 or 12 feet, whatever is necessary to put his shaft in the clear; and he says, well, if you will do that I think it is mighty fine, and I will recognize the survey; and with that we went ahead, and he allowed me to build a road over his ground in order to get to my property, and hauled the hoist up there for us; and one of his sons was employed on our property for a month or six weeks." In pursuance of said understanding between Mr. Nenzel and Mr.

Noble, the latter and his lessees proceeded to use the shaft without interference from Nenzel, and Nenzel, without interference from Noble or his lessees, pursued his mining operations on the Belcher claim until his financial resources were exhausted.

Mr. Nenzel admitted that in the spring of. 1934 Mr. Noble told him he had decided that the Belcher location was on his (Noble's) ground and at the same time told him to stay off of it. When asked if that was the reason he quit, Mr. Nenzel said it was not—that the reason he quit was because he ran out of money. On cross-examination Mr. Nenzel testified, in part, as follows:

"Q. So there was no definite understanding between you and Mr. Noble or the Olsens that the Stoddard survey was to be binding upon anyone? A. Absolute understanding that it would be binding.

"Q. In what way? A. Otherwise I wouldn't have gone in there and spent any money.

"Q. In what respect? A. That the line would be recognized.

"Q. That the line would be recognized? A. Yes, sir.

"Q. As made by Stoddard? A. Yes, sir; otherwise why should I go in and spend money on his ground if he claimed it; that was thoroughly understood."

On June 15, 1933, defendants, as parties of the first part, and G. W. Warmouth and W. W. Hill, lessees of plaintiff, as parties of the second part, entered into the following agreement: "Party of the first part agree to allow party of the second part to continue to develop their lease on the Noble property. This shaft is located on the South-east corner of the Hawk Eye mining claim which is owned by Olsen Bros."

L. J. Olsen, one of the defendants, testified that in the last part of 1934 or early in 1935 Mr. Noble told him he thought defendants were working on his ground, "but it didn't matter, he would let us work there as long as we wanted to."

As against the foregoing, plaintiff points out that:

Defendants knew that section 15 was a patented railroad section, and that the true boundary line between it and section 10 could only be that established by the original government survey. In response to defendants' reliance upon the words "648 feet, more or less" used in the description of the irregular piece of ground hereinbefore mentioned, plaintiff calls attention to the words immediately following, namely, "to the section line between ten (10) and fifteen (15), of T. 33 N. R. 30 E., M. D. B. & M.," and argues that these words must prevail over those which defendants contend show acceptance by plaintiff of the Stoddard line.

Plaintiff further directs attention to the fact that, regardless of the Stoddard survey, neither plaintiff nor defendants knew the true location of the boundary line between sections 10 and 15, at least until Mr. Huntington made his survey. Plaintiff maintains that this is conclusively shown, as to defendants, by the following provision in the contract of sale wherein E. F. Laughton and R. C. Olsen agreed to sell the Belcher claim to R. Nenzel: "The second party shall commence a survey of said property prior to May 15, and diligently continue same to completion. If a government survey shall subsequently be made and any change in section lines shall occur, then the first parties shall be held free of all claims or damage by reason thereof."

L. J. Olsen, one of the defendants, admitted that in the last part of 1934 or early in 1935 Mr. Noble told him he thought defendants were working on his ground, and that Mr. Noble told him that two or three different times.

George B. Noble, president of plaintiff corporation, testified, in part, as follows: "From 1931 until the spring of 1934 we were in absolute possession of that ground, and there was nobody on it, and we weren't bothered by any one; and we did this work mostly during that period; and in the spring of '34 they came on and started to work, without my permission." By reason of the admitted fact that at the time defendants

started their shaft Mr. Noble told them he believed it was on plaintiff's ground, plaintiff maintains that any laches or negligence in taking immediate steps to determine the true location of the boundary line between said sections 10 and 15 can no more be attributed to plaintiff than to defendants themselves.

R. C. Olsen, one of the defendants, testified on cross-examination to a conversation with Mr. Noble in 1935 in which the latter stated that if defendants should lose the ground in question in the event of a survey he would give them a lease.

L. J. Olsen, one of the defendants hereinbefore referred to, on cross-examination testified, in part, as follows:

"Q. And the only expression that you have had from Mr. Noble with reference to your workings, is that he told you that you were on his ground, but you could work there as long as you wanted to? A. No. He said he thought we was on his ground, and that we could work there as long as we wanted, and he would never bother us.

"Q. And with that understanding you continued to work. A. Well, we continued to work there. We figured we was on the ground —

"Q. That is it. A. Sure.

"Q. In other words then whatever Mr. Noble told you had no influence upon you whatever as to your rights upon that ground? A. We figured that the Stoddard line was the line.

"Q. Hold on a minute. To the Stoddard line? I understand that; but it didn't make any difference to you what Mr. Noble said, and if he had told you to get off the land would you have gotten off at that time? A. No.

Q. No; because you were standing on your location. A. Yes."

Witness also admitted that in 1935 Mr. Noble told him he thought the Stoddard line was wrong and that he was going to check it.

George B. Noble, president of plaintiff corporation, testified, in part, that in the summer of 1935 "I sent for the Olsen boys to come over to my house. They come over. I told them this trouble over these boundary lines had gone far enough, and I asked them if they wouldn't make a joint survey with me and determine where the real line come, and I told them that if their present workings fell on my side of the line that I would give them a lease at a low royalty; and they said they wouldn't spend any money for surveying. So I asked them if they would consider consolidation, and they flatly refused it. That was about all the conversation."

Mr. Noble further testified that early in the spring of 1935 he had a conversation with defendant L. J. Olsen at Lovelock with reference to Noble's having entered into a lease or contract and giving Dawes an option. "Olsen told me that Mr. Dawes came up to their workings and asked them what about paying royalty on the ore that they was taking out, and he told me that Mr. Dawes told me he had agreed, and was going to survey the ground probably within four months, and he says I told Mr. Dawes if you survey this ground and find us on the ore I will be glad to pay you royalty on it, or if you will not lease it to me I will take our things and move off. He says to me, I know the ground belongs to you, but I am going to stay with it as long as I can." (Mr. Olsen denied that any such conversation took place.)

Regarding the testimony of Mr. Nenzel hereinbefore referred to, Mr. Noble testified that he had no conversation with him at all, and that he never said he acquiesced in the Stoddard line or that the Olsens could stay on the ground. He further testified, and it was not denied, that he and plaintiff had paid all taxes on the land constituting the subject matter of the suit, ever since they owned it. He did not know of Tom Mack's ever having run a line "up there anywhere," though he (Noble) had been there most all the time.

Jack Vaughn, an owner of ground at Scossa, testified

that in the early spring of 1933 he was present at a conversation between Mr. Noble and Mr. Olsen. "Gus Warmouth was sinking a shaft there, had a lease, and Mr. Stoddard was running a line this day and it went over their windlass, over the Gus Warmouth, on the North end about 18 inches, and there was some remark that Mr. Olsen, Ralph, had made, I don't know what it was, he and Mr. Noble had some conversation, and I was standing about 30 feet above the shaft. They walked up near where I was standing. Mr. Noble says to Ralph Olsen, if you try to stop this man from working there I will have this line put where that line belongs. Ralph says, I have no partner, and he says, that goes for you and your partner both. So that was the conversation."

George B. Noble, called in rebuttal, testified that he did not, at any time, state to Mr. Nenzel or any one else that 'the Olsens could work the ground as long as they wanted to, as long as they didn't interfere with this lease or the Warmouth lease."

Coming now to a consideration of the law applicable to this case, we observe, first, that adverse possession for the statutory period is not in issue; and second, that respondents do not contend that the trial court was in error in deciding that plaintiff was not foreclosed by the statute of limitations from commencing and maintaining this action.

The essential elements of equitable estoppel are set forth in Bigelow on Estoppel (5th ed.), p. 570, Pomeroy's Equity Jurisprudence (4th ed.), vol. II, sec. 805, the law encyclopedias, many other texts and many hundreds of judicial decisions. Referring to these elements, Pomeroy says (Eq. Jur. vol. II, p. 1644): "One caution, however, is necessary, and very important. It would be unsafe and misleading to rely on these general requisites as applicable to every case, without examining the instances in which they have been modified or limited." The doctrine should be applied with caution, and invoked only when clearly required by considerations of equity and justice, for if used arbitrarily in

dubious cases it could easily become an odious rather than a beneficent doctrine. In considering such individual case, courts should keep in mind the purpose of the defense of equitable estoppel, which is to prevent a party from asserting his legal rights when he has so conducted himself that it would be contrary to equity and good conscience for him to allege and prove such rights.

Appellant maintains that the Stoddard line was not accepted by either Mr. Noble or plaintiff, or by the defendants themselves. The evidence, however, is clear that defendants have accepted said line ever since it was run, and that it was also accepted by Mr. Noble and the plaintiff for more than two years after that time. The fact that defendants realized that some future survey might place the boundary line between said sections 10 and 15 at some other location than that of the Stoddard line is not inconsistent with the fact, clearly established by the evidence, that they have at all times accepted that line. Our reading of the record convinces us that neither plaintiff nor Mr. Noble asserted any right to that portion of the Hawk Eye claim lying north of the Stoddard line for more than two years after that line was run. During this period Mr. Noble and the plaintiff, as parties to the deeds, agreements, and other transactions hereinbefore referred to, showed their acceptance of the Stoddard line. Later, it is true, they questioned the correctness of the location of that line, and finally asserted their rejection of it altogether; otherwise this suit would not have been brought.

Most of the work done and expense incurred by defendants on the Hawk Eye claim was in the years 1934 and 1935. It is admitted that about the time defendants started their shaft in the spring of 1934, the president of plaintiff corporation informed them he believed they were sinking their shaft on plaintiff's ground. From this fact counsel for appellant argues that it was no more incumbent on plaintiff than it was on defendants to take immediate steps to determine

the true location of the boundary line between said sections. A similar situation was presented to the circuit court of appeals, Sixth circuit, in the case of High Gravity Oil Co. v. Southwestern Petroleum Co. et al., 290 F. 370, wherein the court, at page 375, said: "We think the situation here developed satisfies the spirit of the Kentucky rule, as well as makes a good defensive case in equity. Four or more wells were thereafter drilled by defendant on the strip in controversy with the High Gravity Company, and the only objection made was that during the drilling of the first (which seems to have been below the top edge of the cliff) plaintiff's manager said to the defendant, 'I think you are drilling a well for us.' An attempt in equity to enforce such a claim, after several more have been drilled 'for us,' and against a driller who has always claimed in adverse right, is not strongly appealing." So here, in view of the fact that Mr. Noble had been partly instrumental in bringing about the Stoddard survey, had paid his pro rata share of its cost, and thereafter participated in a number of transactions wherein the Stoddard line was recognized, we do not think plaintiff could prevent an estoppel by merely informing defendants it believed they were on its ground where, as in the instant case, it stood by until well into the summer of 1935 before requesting defendants to give up the property, or instituting a suit for the purpose of compelling them to do so, in the meantime operating properties next to the Hawk Eye and being fully cognizant of the large amount of work being done and money being expended by defendants.

"There is no class of property more subject to sudden and violent fluctuations of value than mining lands. A location which today may have no salable value may in a month become worth its millions. Years may be spent in working such property apparently to no purpose, when suddenly a mass of rich ore may be discovered, from which an immense fortune is realized. Under such circumstance, persons having claims to

such property are bound to the utmost diligence in enforcing them, and there is no class of cases in which the doctrine of laches has been more relentlessly enforced." Lindley on Mines (3d ed.), vol. III, sec. 872, p. 2189.

"The duty of inquiry was all the more peremptory, in this case, from the fact that the property of itself was of uncertain character, and was liable, as is most mining property, to suddenly develop an enormous increase in value. This is actually what took place in this case. A property which, in October 1880, plaintiff sold to Chatfield upon the basis of $4,800 for the whole mine is charged in a bill filed October 21, 1887, to be worth $1,000,000, exclusive of its accumulated profits. Under such circumstances, where property has been developed by the courage and energy and at the expense of the defendants, courts will look with disfavor upon the claims of those who have lain idle while awaiting the results of this development, and will require, not only clear proof of fraud, but prompt assertion of plaintiff's rights. Felix v. Patrick, 145 U. S. 317, 334, 12 S. Ct. 862 [36 L. Ed. 719, 727]; Hoyt v. Latham, 143 U. S. 553, 567, 12 S. Ct. 568 [36 L. Ed. 259, 265]; Hammond v. Hopkins, 143 U. S. 224, 12 S. Ct. 418 [36 L. Ed. 134]; Great West Min. Co. v. Woodmas of Alston Min. Co., 14 Colo. 90, 23 P. 908. The language of Mr. Justice Miller in Twin-Lick Oil Co. v. Marbury, 91 U. S. 587, 592 [23 L. Ed. 328, 331], with regard to the fluctuating value of oil wells, is equally applicable to mining lodes: 'Property worth thousands today is worth nothing tomorrow; and that which today would sell for a thousand dollars, at its fair value, may by the natural changes of a week, or the energy and courage of desperate enterprise, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over

has been at the risk of another, to come in and share the profit.'" Johnston v. Standard Mining Co., 148 U. S. 360, 13 S. Ct. 585, 589, 37 L. Ed. 480, 486.

■ "It is a rule almost of universal application that one who stands by and sees another purchase land or enter upon it under a claim of right, and permits such other to make expenditures or improvements under circumstances which would call for notice or protest, cannot afterwards assert his own title against such person." 10 R. C. L. 782.

"One who with knowledge of the facts and without objection suffers another to make improvements or expenditures on, or in connection with, his property, or in derogation of his rights under a claim of title or right, will be estopped to deny such title or right to the prejudice of that other who has acted in reliance on and been misled by his conduct." 21 C. J. 1160.

"It is said to be a very familiar rule of the law of estoppel that if the owner of an estate stands by and sees another erect improvements on the estate in the belief that he has a right to do so, and does not interpose to prevent the work, he will not be permitted to claim such improvements after they are erected. * * * It has also been declared that one who knowingly and silently permits another to expend money on land under a belief that he has title will not be permitted to set up his right to the exclusion of the rights of the one who made such improvements." 76 A. L. R. 304, 306.

■ "It is a familiar doctrine that, apart from any question of statutory limitation, courts of equity will discourage laches and delay in the enforcement of rights. The general principle is that nothing can call forth the court of chancery into activity but conscience, good faith, and reasonable diligence. Where these are wanting, the court is passive and does nothing." 10 R. C. L. 395.

No reason is made to appear why such a survey as that of Mr. Huntington was not caused to be made by

plaintiff or Mr. Noble before defendants had done so much work and expended so much money in developing the Hawk Eye claim.

■ Neither affirmative acts or words, nor silence maintained with the fraudulent intention to deceive, are indispensable elements of an equitable estoppel. Intentional deception is not a necessary ingredient. Wampol v. Kountz, 14 S. D. 334, 85 N. W. 595, 86 Am. St. Rep. 765, 768; Lawrence on Equity Jurisprudence, vol. 2, sec. 1045, p. 1131.

■ In this case there was not, as in many boundary cases, a direct agreement between the respective parties that the Stoddard line was to be accepted as the boundary line between said sections 10 and 15; but an estoppel may arise whether there be such agreement or not. Acton v. Dooley, 6 Mo. App. 323, 327; 21 C. J. 1120. Where other requisites are present, an estoppel in pais may be established against a party, regardless of agreement, upon his conduct, which embraces "not only ideas conveyed by words written or spoken and things actually done," but includes silence and omission to act as well. Wampol v. Kountz, supra.

■ In cases relating to boundaries or title to or possession of real property, the doctrine of estoppel is not applied so frequently where acquiescence has been for a short time as in those where it has been for over a long period of years; but the period of time is not always the determining factor, and under some circumstances an equitable estoppel may arise when the period of acquiescence is short. Champ v. Nicholas County Court, 72 W. Va. 475, 78 S. E. 361; 21 C. J. 1161–1162.

■ After a careful consideration of the record, we are unwilling to disturb any of the findings of the trial court because, in our opinion, the evidence was sufficient to show that the defendants would not have proceeded as they did had they not relied, to their detriment, upon the conduct of Mr. Noble and the plaintiff.

■ In its assignment of error on the issue of estoppel, appellant further contends that defendants were

not entitled under their pleadings to offer any evidence on that issue. It appears from the record that after an order was made on stipulation of respective counsel sustaining plaintiff's demurrer to the answer and cross-complaint, defendants filed their amended answer and cross-complaint in which the paragraph relating to estoppel was amended by the addition of a number of allegations not appearing in the original answer and cross-complaint. Plaintiff did not demur to the amended answer and cross-complaint, but filed its reply thereto. Furthermore, at the trial, defendants offered their testimony and evidence on the issue of estoppel without objection on the part of plaintiff. It is our opinion that any objections of plaintiff to defendants' pleading on the issue of estoppel were waived. 21 C. J. 1250, sec. 262.

Error is predicated upon the action of the district court in admitting in evidence, over the objection of plaintiff, surveyor Pray's map, defendants' exhibit I, and in denying plaintiff's motion to strike Mr. Pray's testimony upon the ground that it was incompetent for the purposes for which the map was introduced in evidence. We think these rulings of the trial court were correct, and that the aforesaid objection and motion affected the weight rather than the admissibility of Mr. Pray's map and testimony.

The judgment and order appealed from are affirmed.