# GODFREY *v.* DUTTON.

EQUITY; FRAUD; CONSTRUCTIVE NOTICE; PRINCIPAL AND AGENT;
    REAL ESTATE BROKERS; TRUSTS AND TRUSTEES.

In a suit in equity by the former owner of certain real estate who
    had exchanged it with one D for property to which the latter
    had no title, whereby the complainant sought an annulment
    of a sale and conveyance made by D of the property of which
    he had defrauded the complainant, upon the ground that the
    grantee was chargeable with notice of D's fraud, it appeared
    that the defendants, W & Co., real estate brokers, had form-
    erly had the property listed for the complainant for $55,000,
    but having received no offer for it had stricken it from their
    books; that complainant conveyed the property to D, on
    March 26, 1896, and that on April 13, 1896, D conveyed it to R,
    a clerk of W & Co., for $25,000, less existing incumbrances
    amounting to $17,500 and certain arrears of interest and taxes;
    that W & Co. acted ostensibly as brokers for D in the transac-
    tion, being described as such in the contract of purchase
    between D and R, and shared with D's attorney a brokerage
    commission paid by D, but were in fact the real purchasers
    and paid the purchase money; and that inquiry by W & Co.
    of the complainant when they purchased the property would
    not have resulted in arresting the sale, as complainant did not
    discover D's fraud until several months afterwards. *Held*,
    reversing a decree dismissing the bill of complaint upon the
    ground that W & Co. were innocent purchasers for value
    without notice, (1) that the circumstances were not such as
    to put W & Co. upon inquiry and they were not chargeable
    with notice of D's fraud; but, (2) that W & Co. were agents
    of D to sell and, being such, had no right to purchase, and
    that D's right, as principal, to disaffirm the sale inured to
    complainant, for whom he held the property as trustee, and
    that therefore complainant was entitled to have the deed from
    D vacated upon her reimbursing W & Co. for the amount
    expended by them on account of their purchase, less rents
    and profits received by them or which they might have
    received in the exercise of due diligence.

No. 892.  Submitted January 5, 1900.  Decided February 8, 1900.

HEARING on an appeal by the complainant from a decree
of the Supreme Court of the District of Columbia dismiss-
ing a bill in equity to vacate certain deeds for alleged fraud.
*Reversed.*

The COURT in its opinion stated the case as follows:

This suit was begun with the original bill filed September 1, 1896, by Lily Alys Godfrey, and the defendants therein named were Stephen A. Dutton and wife, Louis W. Richardson and Mary Alice Godfrey.

Complainant alleged that on March 26, 1896, the legal title to lots 1,ᵉ 2, 3 and 66 in square 134, and lot 40 in square 92, in the city of Washington, was vested in her mother, Mary Alice Godfrey, in trust for complainant. Said first-named lots were incumbered by three different deeds of trust to secure loans amounting to about $17,500. On said date complainant and her said mother conveyed the said property to Stephen A. Dutton subject to the incumbrances aforesaid. The consideration for said conveyance was a contract for the conveyance by Dutton to complainant of certain leasehold and other property in the city of New York, where all the parties then resided. On April 13, 1896, said Dutton and wife conveyed the lots aforesaid to defendant, Louis W. Richardson, subject to said incumbrances.

That the conveyance to Dutton was obtained by fraudulent representations and without actual consideration; and that the conveyance by Dutton to Richardson was fraudulent, without consideration and void. The prayer was for the cancelation of said deeds and the recovery of the property subject to said incumbrances.

Dutton and wife made no answer, and as to them, final decree was duly entered in accordance with the prayer of the bill upon an order *pro confesso.* This ended the litigation as regards lot 40 in square 92, situated on Connecticut avenue. Richardson answered December 1, 1896, admitting the purchase of the remaining lots, situated on New Hampshire avenue at its intersection with Q and Eighteenth streets, and alleging the payment therefor in good faith of $25,000, part of which consisted of the assumption of the incumbrances thereon. He further answered that he made

the purchase through B. H. Warner & Company, real estate brokers, and gave the history of the negotiations, resulting in the contract of purchase, examination of title, payment of purchase money, and receipt of conveyance. He expressly alleged that neither he nor said B. H. Warner & Co. had any knowledge, direct or indirect, of the equities of the complainant; that possession was immediately given to him, through his said agents, B. H. Warner & Co., and the same has continued since. His answer also sets out notice to the complainant of his purchase and assent by her thereto without objection, through the following correspondence:

"April 17, 1896.

"Mrs. MARY A. GODFREY,

"287 West 70th St., New York City, N. Y.

"DEAR MADAM: A client of ours has recently purchased premises known as 1801 Q St., N. W., this city, from Mr. Dutton. We called on Gen. Robertson, who has had charge of the property, for the keys this morning, and he informed us that he had, at your request, returned the same to you. We will be very much obliged to you if you would forward the same to us by mail or by express at our expense.

"Very truly yours,

"B. H. WARNER & Co."

And thereupon, the 18th day of April, 1896, in response to the above letter, the said complainant's mother, for and on behalf of complainant, sent and delivered said keys to said B. H. Warner & Co., agents of this defendant, and accompanied the same by a letter, of which the following is a copy, to wit:

"B. H. WARNER & Co.

"DEAR SIRS: Please find inclosed key to the house 1801 Q St. N. W.

"Yours very truly,

"M. A. GODFREY,

"287 W. 70th St., Corner West End Ave., New York.

"April 18th, '96."

The contract for the purchase of said lots, under which the conveyance was made three days later, is made an ·exhibit to this answer. It is a printed form of the firm of B. H. Warner & Co., showing the names of the four members thereof, namely, Brainard H. Warner, Louis D. Wine, Geo. W. F. Swartzell and Clarence B. Rheem. The first paragraph reads as follows:

"Articles of agreement, made and entered into this 10th day of April, A. D. one thousand eight hundred and ninety-six, by and between ———, party of the first part, and Louis W. Richardson, party of the second part, in manner and form following: The said party of the first part in consideration of the sum of five hundred (500) dollars to their agents, B. H. Warner & Co., duly paid as a deposit, the receipt whereof is hereby acknowledged, hereby agree to sell unto the party of the second part the following described real estate in the city of Washington and District of Columbia: lots 66, 1, 2, & 3, square 134, Wash., D. C." 

Then follows a recital of the consideration, terms of payment as heretofore stated, and a final provision that the terms of sale are to be complied with in five days; title to be good and marketable or deposit returned.

This was signed by S. A. Dutton and L. W. Richardson. It appears from the testimony that when first drawn and sent to the attorney of Dutton the limit for completion was fifteen days; she changed it to five before execution and delivery.

On July 17, 1897, complainant filed an amended and supplemental bill, under leave obtained February 16, making Brainard H. Warner and Louis D. Wine parties defendant. The charges of the original bill are amplified in respect of the fraudulent acts of Dutton, who, it is alleged, was indicted in the city of New York on August 28, 1896, for felony, the offense being the fraudulent procurement of complainant's signature to the agreement aforesaid, made March 26, 1896, and has since been convicted and confined

in the State penitentiary. The special charges made against the defendants Warner and Wine are, that the said lots had, some years before, been in their hands as brokers for sale at a fixed price of $55,000. That they were worth said sum. That the price for which said lots were purchased from Dutton ($25,000) was grossly inadequate. That when the proposition to sell them for said sum was made by the attorney of Dutton, to B. H. Warner & Co., it was the duty of Warner and Wine to inquire of complainant, whose address in New York was known, whether there existed any reason why a sale for such price should not be made, and whether Dutton had honestly acquired the conveyance thereof from complainant. That instead of making inquiry or giving notice to complainant, they set about the acquisition of the said lots for their own benefit, and, for the purpose of concealing their connection with the transaction, caused the title to be conveyed to said Louis W. Richardson. That said Richardson was the nephew of said Wine, and a young man, without means or business experience, employed by B. H. Warner & Co. as a clerk. That he was used as a tool by said Warner and Wine, and if any consideration at all was paid, it was paid by them and not him, and that they claim the property and are collecting the rents of the house thereon.

Warner and Wine answered the charges of the bill under oath, as well as many interrogatories propounded therewith to obtain discovery. They denied having been agents for the sale of the property, and said that in 1893, Mary A. Godfrey, the trustee, had informed B. H. Warner & Co. and other real estate brokers, that she would sell the lots for $55,000, and pay a commission if a purchaser should be found. No offer had ever been made to them, and the property had, a long time before April, 1896, been stricken from their sales bulletins. That complainant knew that Dutton had been and was trying to borrow money upon the said lots, and was advised of its sale by him immediately there-

after, and made no objection thereto, but co-operated with him. They aver that they made the purchase for a fair consideration and in perfect good faith.

The history of the transaction is thus stated in the answer:

"On or about the 10th day of April, 1896, Mrs. Ellen Spencer Mussey, a member of the bar of this District, stated to the defendant Warner, at his office No. 916 F street, N. W., that she had for sale the said lots in square 134, and was referred by the said Warner to the defendant Wine, said Warner being then engaged; whereupon the said Mussey stated to the defendant Wine that she was acting as the attorney for one Stephen A. Dutton, of New York, who had several judgments against him in that city which, for business reasons, it was important to him to satisfy immediately or be subjected to great loss, and that for this reason he desired to make an immediate sale of the said lots; that he would sell the same at $25,000 less a commission of 3 per centum; and that said Dutton had come to her with a recommendation given by a business man of high standing in New York, who had been a classmate of her deceased husband. Thereupon, after some conference between these defendants, they agreed to purchase the said property at the price named, but, as they bought it to sell again on their joint account and for their joint benefit, and as they were married men, for purposes of convenience they agreed that the title should be conveyed to the defendant, Louis W. Richardson, who could convey direct to any purchaser without the trouble and possible inconvenience of requiring any conveyance thereof to be executed and acknowledged by the wives of these defendants; and, as the result of the said negotiation and agreement, the contract to sell was entered into, a copy of which is filed as a part of the answer of the defendant Richardson to the original bill herein, which contract is hereby referred to and prayed to be read as part of this answer. The Columbia Title

Insurance Company was thereupon employed to examine the title to said lots in the usual and regular course of business, and a check made by the firm of B. H. Warner & Co. was drawn to its order and delivered to it for the sum of seven thousand and eighty-six dollars and thirty-three cents ($7,086.33) on the 13th day of April, 1896, at which time the said title company completed its report, showing the title good in said Richardson. There were at that date taxes and interest against the property amounting to $413.67, and other incumbrances aggregating $17,500, which sums, together with the amount of said check, which last-named amount was applied by said title company to payment for said property as per the terms of the said contract of purchase from the defendant Dutton.

"Further answering the said paragraph, these defendants deny that they caused the conveyance of the said property to be made to the defendant Richardson for any purpose of concealment, or for any other purpose than the wholly innocent one of taking the title in such manner as would enable them more readily to handle and dispose of said property than if the title were vested in themselves, and they show to the court that it is, and for many years has been, the custom of real estate dealers in the District of Columbia to take title in this manner under similar circumstances, which custom has been and is well known throughout said District."

The court below, being of the opinion that Warner and Wine were purchasers for value, without notice of the fraud of Dutton, entered a decree, on January 24, 1899, dismissing the original and supplemental bills as to Richardson, Warner and Wine.

*Mr. Arthur A. Birney* and *Mr. Henry F. Woodard* for the appellants.

*Mr. J. J. Darlington* and *Mr. Wm. F. Mattingly* for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. The fraud practiced by Dutton upon the unsuspecting complainant and her mother, whereby they were induced to execute conveyances to him of the several parcels of property in Washington, is unquestioned, and has been settled by the decree against him; which decree also removes the Connecticut avenue property from the controversy.

The record contains an enormous volume of testimony, much of which is irrelevant, directed to the issues between complainant and the defendants Warner and Wine, respecting their knowledge of the fraudulent character of the title that had been acquired by Dutton.

An attempt was first made by the complainant to prove that, prior to this transaction, Warner had become acquainted with Dutton, had been seen in his office in New York and in his company on several occasions, and was aware of his pecuniary condition and real character; and hence ought to have suspected—to such an extent as to be put upon inquiry—that Dutton had come into the apparent ownership of this valuable property by means of fraud and false pretenses.

Counsel, who appeared for the appellant on this appeal, has admitted the failure of this testimony; and properly so, we think, because it comes from questionable sources, and has, besides, been completely met by evidence on behalf of the defendants.

It is an unquestioned fact, also, that Dutton actually received from Warner and Wine nearly $7,000 in cash, the same being the excess of the consideration agreed upon over and above the sum total of the incumbrances assumed in the conveyance made to Richardson.

2. The final contention is, that, treating Dutton as an entire stranger to his vendees, the facts and circumstances of and surrounding the transaction were not only sufficient to cause them to suspect, but also to indicate that they did in fact suspect that Dutton had acquired his apparent title

through fraud practiced upon the complainant; and that, put upon inquiry thereby, they would have discovered the same had they exercised ordinary care.

This contention is founded on four main facts claimed to have been proved by the remaining testimony, namely, the gross inadequacy of the consideration; the former agency of the firm of B. H. Warner & Co., for sale on behalf of the complainant; the haste with which the negotiation was conducted and the sale completed; the execution of title to Richardson for the benefit of Warner and Wine, and the concealment of their interest.

In view of our conclusion in respect of the final disposition of this case we think it unnecessary to consume time with a lengthy review of the mass of evidence bearing on the foregoing points, and of all the inferences deducible therefrom.

It is sufficient, therefore, to say: (1) That there is great conflict of opinion between the many well informed witnesses who have testified to the value of the premises in April, 1896. These estimates range between $25,000 to $30,000 upon one side, and from $45,000 to $55,000 upon the other.

Without undertaking the difficult task of determining the real market value of the property at that time, we are not satisfied that the price paid was so low, or so out of proportion to that value, as to suggest a suspicion of the fairness of the seller's title.

(2) That the testimony does not show that at the time of the purchase from Dutton, B. H. Warner & Co., of which firm Warner and Wine were leading partners, were the agents of complainant for the sale of the property. It had been upon their books at one time, as well as upon those of many others. They had no negotiations looking to its sale, and had, a considerable time before, dropped it from their published lists. The reliance of complainant for the sale of her property was clearly not upon them at the time, but another.

(3) That the haste with which the negotiation was conducted was not so unreasonable as, of itself, to naturally excite suspicion and prompt investigation. Dutton was represented by a reputable attorney to whom he had come with a letter of introduction. He represented that he had judgments against him which made it necessary for him to raise money immediately. An unsuccessful attempt was made to secure a loan upon second mortgage; and then it was offered for sale.

(4) That the contract for the purchase was made in the name of Richardson by Warner and Wine, who were in fact the real purchasers, though professedly acting as Dutton's agents, through the use of the name of B. H. Warner & Co., does not warrant the inference, in connection with the other circumstances of the transaction, that they either colluded with Dutton, or must have known the purpose of his sale. Their real ownership was known to several persons at least, at the time, though intended to be kept from the public generally, as appears from the transaction itself, and from the letter of B. H. Warner & Co., asking for the key and stating that the lots had been sold to their client.

Richardson was a young man without means, a nephew of Wine, and an employee of B. H. Warner & Co. Men of their business experience must have been aware that his mere agency for them could not have been kept concealed from inquiry, even if concealment had been studiously attempted; and also that studied concealment and express denial would be regarded as evidence of their guilty knowledge or collusion. The inference is reasonable, therefore, that they used the name of Richardson for the purposes stated in their answer.

We do not rest any part of this conclusion upon the fact, as proved, that such lodgments of title are frequently made by purchasers of land for convenience, and not regarded as improper.

If such a practice be common for convenience in avoiding

the procurement of the signatures of the real owners' wives, or to evade personal liability for the assumption of incumbrances, or to conceal from the general public the fact that agents dealing in lands for others are also engaged in purchasing on their own account, or for other reasons that might be suggested, we are not to be understood as giving it our indorsement.

Any custom that looks to the concealment of the truth of a transaction, or tends to mislead the public generally, although it may not be accompanied by an intention to defraud any particular person, is more honored in the breach than the observance.

3. If it were conceded, however, that the circumstances attending the transaction were of a character that might, to a cautious mind, have suggested inquiry into the nature of Dutton's apparent title, our conclusion, from the testimony on behalf of complainant, is that such an inquiry would not have resulted in arresting the sale.

The testimony shows that the complainant and her mother had implicit confidence in Dutton and were under his influence.

They believed that he was a very wealthy man.  He lived in a house which he made them believe had cost $70,000.  They had not the slightest suspicion of his true character.

They believed that the property he contracted to convey to them in exchange for the Washington property was very valuable.  They took the statement of his attorney regarding the title, when the slightest inquiry or investigation would have clearly shown the fraud practiced upon them.  So completely were they satisfied with the exchange contracted for, that when Dutton went to Washington, as they supposed, to examine the property, on March 31, 1896, they sent the following telegram to Mr. John B. Wight, who had been acting as agent for the sale of the property: "Sold New Hampshire avenue corner to New York party last week for full price; they will look at property today; recommend

you as best real estate agent. If they call, please uphold
my valuation and praise property in every respect. I want
them to be satisfied with purchase."

Dutton was in Mr. Wight's office with the deed in his
pocket when this dispatch came.

Complainant did not, of course, know or suspect that
Dutton needed no commendation of the property, and that
his purpose was to sell it for what he could get. She did,
however, expect him to obtain a loan upon it, as he had led
her to believe that he would erect a handsome hotel or
apartment house upon it.

But the title conveyed was absolute. There was certainly
no express collateral agreement that he should build on the
property, or that he should not sell it.

There was no occasion for such a condition under the cir-
cumstances existing at the time. They had sold for what
they believed to be a "full price," to a man supposed to be
worth millions, and in whom they had perfect faith. After
his return from Washington they executed new deeds to
cure some supposed defect in the former.

When informed by the letter of B. H. Warner & Co. that
the property had been sold to a client who wanted the key,
they sent it without a word of inquiry. The terms of this
letter were plain enough, but complainant testified that she
thought there was some mistake because Dutton had told
her that he had obtained a loan upon the property and
intended to erect a large apartment house. But instead of
inquiring of Warner & Co. as to this, she inquired of Dutton.
He told her it was "a mere clerical error;" that he had just
obtained a large building loan and had plans for the house.
He exhibited his plans, consulted complainant and her
mother in regard thereto, and, in complainant's own lan-
guage, "explained eveything so satisfactorily that no doubt
or suspicion in any way entered our minds."

When complainant first suspected Dutton does not appear;
it is apparent, however, that it was not before some time in

July, 1896. In June, or about July 1, she was induced by him to sign an additional agreement concerning the wharf leasehold that he had given her for her property, whereby she was made to assume certain judgments against him. She said she did not understand the matter fully, but "had confidence in him and did what he told me." Prior to this, about April 21, one Czaki, who had been concerned in affairs with Dutton, undertook to tell her of Dutton's real character. Dutton came in while Czaki was talking and the latter "slid out of the door." Dutton explained Czaki's conduct by telling her that the latter had turned against him under the influence of the "Ice Trust" that was engaged in his persecution. She was completely reassured, and gave Dutton a paper left with her by Czaki. This seems to have been a subpœna to her in some supplementary proceedings by judgment creditors of Dutton. Complainant and her mother had interviews with Dutton at the Astor House café as late as July, going there, instead of his office, because, as they say, it was pleasanter, and also for fear that papers might be served upon them at the latter place.

Now, in the light of all this evidence, we can not believe that a direct inquiry by Warner and Wine, before their purchase, would have led to a denial of Dutton's apparent title.

Notwithstanding the Washington property is the fruit of the fraud practiced by Dutton, it must not be forgotten that this fraud did not consist in obtaining an absolute title to that property, when none was intended to be conveyed; but in procuring the title upon false representations as to the title of that which he exchanged for it. Had that property proved to be as represented, complainant would have had no cause to complain of any disposition made by Dutton of the Washington property. The real fraud perpetrated, then, in regard to the consideration given to her, was not discovered, as we have seen, until July; consequently, the presumption is not at all reasonable that the inquiry by

Warner and Wine of the nature of Dutton's title would have developed that fraud.

It is true that when one acquiring a title, has acted without inquiry, under circumstances so strongly suggestive as to make inquiry a positive duty, it would be a dangerous innovation to rest the question of implied or constructive notice upon the possible result of inquiry had it been made; and we are not to be understood as enouncing any such doctrine.

The case at bar presents no such question. The circumstances relied on as putting the purchasers upon inquiry are, as we have seen, insufficient to make that inquiry a duty. Hence, under the special circumstances of the case which lead to a conclusion, not speculative, but reasonably certain, we have deemed it just to consider what would have been the result of direct inquiry of the complainant in respect of the nature of the title then held by Dutton.

If this case necessarily turned upon the contentions above considered, we would be compelled to affirm the decree as the inevitable result of the conclusions announced thereon; for it is a well settled rule that one who has put it within the power of another to commit a fraud upon himself and a third person, who parts with value without notice, must suffer the consequences rather than visit them upon that person.

4. We come now to consider the case from another point of view made clear by the testimony, though it may not be specifically presented by the pleadings.

As before suggested, it is not controverted that complainant was grossly defrauded by Dutton, and that as to him she is entitled to have restoration of her property—a right that has been accorded her in the matter of the Connecticut avenue property. She is entitled, therefore, to all such relief as can be afforded without injury to the just rights and interests of others.

Whilst Dutton was apparently vested with a legal title to

the New Hampshire avenue lots, he held it, in the view of a court of equity, as a trustee for the complainant.

Saving the rights of innocent purchasers from Dutton, her right was paramount, and any equities he might have, arising out of his dealings with such persons, resulted to her.

Now it is clear that, as between Dutton, and Warner and Wine—vendor and vendees—equity will construe a trust in favor of the former from the relations of principal and agent which the testimony shows existed between them.

Putting Richardson out of further consideration, as a mere figurehead—a person interposed as a conduit of title—Warner and Wine purchased and received title from Dutton. They were at the time the controlling members of the firm of B. H. Warner & Co., real estate brokers, who appear in the preliminary contract as the agents of Dutton, and not of Richardson.

It is a well established rule of law that an agent to sell can not, either directly or indirectly, become the purchaser at his own sale.  *Michoud* v. *Girod,* 4 How. 503, 554; *Veazie* v. *Williams,* 8 How. 134, 152; *Hoyt* v. *Latham,* 143 U. S. 553, 566; *Robertson* v. *Chapman,* 152 U. S. 673, 681; 1 Am. & Eng. Encyc. L. 1075.

It is claimed that Mrs. Mussey was the agent of Dutton, and not B. H. Warner & Co.; but the testimony is distinctly against the claim.

It is very true that she was originally his agent, and so continued to act; but B. H. Warner & Co. associated themselves with her, and practically displaced her, for their names, and not hers, appear in the written contract as agents of the vendor.   This contract was made an exhibit to the answer of Richardson to the original bill, wherein he avers a purchase through them as agents of Dutton, and was made part of the answer and proof of the defendants; and they are bound by it.   It is also in proof that of the $750 paid by Dutton as commissions for effecting the sale, B. H. Warner & Co. received $500 and Mrs. Mussey $250.

There can be no doubt, therefore, that this sale could have been annulled by Dutton upon a timely bill for that purpose, without regard to adequacy of consideration, or complete fairness in all other respects. The inquiry in such a proceeding is not whether there was or was not fraud in fact. The transaction is what the inflexible rule of equity, founded in the soundest public policy, denominates a fraud in law, as differentiated from fraud in fact.

This right of Dutton to disaffirm the sale necessarily results to the complainant, for whom he must be regarded as a trustee by construction of equity.

The disaffirmance can only be decreed, however, upon condition that the complainant shall repay Warner and Wine the money actually paid by them to Dutton, and all other sums that may have been paid by them in the discharge of taxes and incumbrances, less such sums as they may have received, or ought in the exercise of due diligence to have received, as rents and profits of the property, since their possession began. Upon such payment they should be decreed to reconvey the property to the complainant, who to have equity must do equity.

It may be, that to obtain this relief the bill will have to be amended to some extent. If so, it can be done without reopening the case for further testimony. Doubtless, too, a reference to the auditor will be necessary for a statement of the account between the parties before a final decree can be entered.

It follows that the decree dismissing the bill must be reversed, and the cause remanded with directions to vacate the said decree, and take such further proceedings in accordance with this opinion as may be expedient and proper.

The costs of this appeal will be divided equally between the parties. It is so ordered.                    *Reversed.*