DEEP OIL DEVELOPMENT CO. et al. v. COX et al.

No. 15055.

Court of Civil Appeals of Texas.
Fort Worth.

Oct. 14, 1949.

Rehearing Denied Nov. 18, 1949.

314

James W. Harvey, Archer City, James N. Ludlum, Fort Worth, William N. Sands, Fort Worth, Stine & Stine and Vincent Stine, Henrietta, for appellants.

Nelson, Montgomery & Robertson, Wichita Falls, Kilgore & Kilgore and Jno. E. Kilgore, Dallas, for appellees.

McDONALD, Chief Justice.

The purpose of this suit is to impress a constructive trust upon an eighty acre oil lease in Archer County on the theory that a director of a corporation purchased the lease for himself after having been directed to purchase it for the corporation. The corporation has been dissolved since the date of the purchase, and the suit is maintained by the dissolved corporation by and through its officers and directors, by certain stockholders for themselves and all the other stockholders, and by certain other interested parties. The defendants are the director who acquired the lease, two other persons to whom interests in the lease were transferred, and the former president of the corporation. Plaintiffs offer to do equity by paying to defendants, the appellees, such amounts as they have expended in the purchase and development of the lease. Damages are sought in the alternative.

Deep Oil Development Company, the corporation in question, was engaged in the oil producing business at the times material herein. L. F. Cox was its superintendent of production and a director in the company. Cox was also engaged in the oil business on his own account, with the consent and approval of the Deep Oil Development Company. It was Cox's custom, when he found oil properties for sale that he considered would be desirable properties for Deep Oil to own, to bring such poperties to the attention of the company before making any effort to acquire them for himself. Prior to August 29, 1947, Cox learned that a certain eighty acre lease, which we shall refer to as the Wilson lease, could be bought for $32,000, $12,000 in cash and $20,000 payable out of oil. He thought that the lease was a good one, and asked the secretary of the company to call a meeting of the board of directors to consider the matter. Five of the seven member board met in a special meeting on August 29, 1947, Cox recommended the purchase of the lease, and by resolution unanimously adopted, the board authorized the purchase. On the same day Cox obtained from the owner of the lease an oral agreement to sell it to the company on the terms aforesaid.

John W. Thomas was the president and general manager of the company. He was away on a vacation at the time of the board meeting just mentioned, but returned and on September 2nd learned of the plans to buy the Wilson lease. On that day he told Cox that the company would not go through with the deal and said that he would call on the directors to rescind their action of August 29th. Later he told Cox that a majority of the board had agreed with him not to buy the lease. Cox said that he had committed the company to buy it, whereupon Thomas asked Cox why he did not buy it himself. Cox replied that he did not have the money available. Thomas told Cox that he would lend him the $12,000. On September 5th Thomas sent his personal check for $12,000 to the owner of the lease, and transfer of the

lease was made to Cox. Cox gave Thomas his note for the $12,000.

In the latter part of October Cox sold a half interest in the lease to Thomas' two children. Thomas represented his children, who were adults, in the purchase from Cox.

In December Cox drilled a producing well on the lease, other wells followed, and the jury found that the lease was worth $750,000 at the time of trial.

Viewing the evidence in the light most favorable to the verdict, it shows that a majority of the stockholders of Deep Oil had decided, prior to August 29, 1947, that it would be to the best interest of the stockholders to bring an end to the business of the company. They understood that the federal income taxes would be less if they would sell their stock in the corporation than they would be if the corporation should sell its properties and divide the proceeds among the stockholders. With the consent of the majority in interest of the stockholders, although it appears that on advice of counsel they were careful not to take any concerted action in the matter that could be regarded as an act of the corporation, Thomas negotiated with several prospective purchasers. The evidence shows that in all of such negotiations he was undertaking to find a purchaser who would buy the stock of all who wished to sell.

Due to the size and complexity of the business, affairs and properties of the corporation, a thorough estimate of the value of the stock could be made only after an examination of the company's properties that would involve an expenditure of a considerable amount of time and money. The evidence shows that it was customary in such a situation for the seller to agree not to disturb, at least to any material degree, the capital structure of the company while an appraisal was being made by a prospective purchaser, and Thomas testified that he committed himself to such purchasers not to buy new properties, sell old properties, or otherwise change the capital structure during such period of investigation.

Prior to August 29, 1947, conversations had taken place between Thomas and E. H. Eddleman looking toward a possible purchase of stock by Eddleman, and before he left on his vacation, several weeks prior to August 29th, Thomas instructed the secretary of the company to make all books and records of the company available for inspection by Eddleman. Thomas testified that he had an understanding with Eddleman that the capital structure would not be disturbed, etc., and Eddleman, although not agreeing that he and Thomas had such an understanding, testified that such a practice was customary in like situations.

It was because of the understandings just mentioned, Thomas told Cox, that the company would not go through with the purchase of the Wilson lease.

The case was submitted to the jury on 73 special issues. Some of the material findings of the jury are in effect as follows:

(1) It would have been beneficial to the company at all times from August 29th up to the time the first well was finished for the company to have acquired the lease.

(2) Cox did not know, when he acquired the lease from its owner, that the board of directors had not in a board meeting rescinded its action of August 29th, but had sufficient knowledge to put a prudent person on inquiry, which, if pursued with reasonable diligence, would have disclosed such fact.

(3) In September four named directors, including Thomas but excluding Cox, consented as individual directors to rescind the August 29th resolution, but believed at the time that it was to the best interest of the corporation to acquire such lease, and two of the four did not know that Cox would get the lease if the corporation did not take it.

(4) When Cox borrowed the $12,000 from Thomas and agreed to purchase the lease for himself he believed in good faith that he was acquiring good title to the lease.

No issues were submitted to the jury, nor requested, concerning Thomas' good faith in the matter, although the jury found that Thomas' two children believed in good

faith that they were acquiring good title when they bought an interest in the lease and did not know that Deep Oil was claiming any interest. Nor were any issues submitted or requested inquiring if Cox and Thomas had agreed that Thomas or his children should have an interest in the lease.

After making an exhaustive investigation of the properties, business and affairs of the company, in which attorneys, certified accountants and others were employed, Eddleman agreed in October to purchase the stock of all who wished to sell, provided as many as eighty per cent would sell, and on November 19th and 20th completed purchases of 92 per cent of the 400,000 shares of stock at $4.10 per share.

On November 20th a special directors' meeting was held, which was attended by all of the directors of the company, and by Eddleman, Ford, Gay and Rogers, the latter four of whom were not then officers or directors. Thomas resigned and Eddleman was elected director and president. The other six directors tendered their resignations, but the resignations were not then acted upon and the meeting was postponed to November 25th. At the outset of the November 20th meeting the minutes of the August 29th meeting were read, which included the resolution authorizing the purchase of the Wilson lease.

On November 25th Eddleman and three other directors met. Resignations of all but one of the old directors were accepted, although two of them, Cox, and Coffey the secretary of the company, were reelected as directors. Mr. Humphrey, an old director, remained on the board, his resignation not having been accepted, and Gay, Ford and Rogers were elected as new directors. The new board was thus composed of Eddleman, Humphrey, Cox, Coffey, Gay, Ford and Rogers.

The jury also found in substance as follows:

(1) Eddleman had actual knowledge of the August 29th resolution on November 20th, and he failed to notify the defendants of any claims the plaintiffs might have within a reasonable time under all the facts known to him at that time.

(2) Eddleman had sufficient knowledge to put him on inquiry at the time he bought the stock in the company that the directors had passed the resolution of August 29th and that the company did not have apparent title to the lease.

(3) Eddleman did not within a reasonable time after he bought the stock advise any of the defendants that Deep Oil might claim the lease or an interest therein.

(4) Humphrey knew prior to November 25th that the lease had not been bought for the company but had been taken in Cox's name, and prior to November 25th he acquiesced in the company not getting it and in Cox getting it.

(5) Ford had conscious knowledge on November 20th that the directors by resolution had directed Cox to purchase the lease for the company, and after he learned such fact acquiesced in the company not getting it and in Cox getting it. After he learned such fact he waited an unreasonable length of time before the claim of the company was asserted to the lease.

(6) Findings similar to those mentioned in the next preceding paragraph were made with respect to Eddleman, Gay and Humphrey. It is undisputed that Coffey knew all along that the company did not get the lease and that Cox did.

(7) A majority of the directors, excluding Cox, as directors or trustees of the corporation, delayed filing suit until they determined that the first well drilled by Cox was a producer.

(8) Eddleman, after he discovered the true facts, delayed advising the other directors until he determined that the first well was a producer; and also delayed giving any notice to any of the defendants that plaintiffs might claim an interest in the lease until he determined that it was a producer.

(9) When Cox borrowed the $12,000 from Thomas and agreed to take the lease, Thomas told him that the directors had agreed to rescind the August 29th resolution. Cox relied on such statement and

had no knowledge that the company was claiming the lease or any part of it.

(10) Prior to August 29th Thomas agreed with prospective purchasers of stock while such purchasers were checking assets and investigating the value of such stock that Thomas would not consent to the company's disturbing its cash position by sales or purchases of capital assets. In making such agreement he was acting for the benefit of all stockholders who desired to sell their stock. He knew that there were some stockholders who did not want to sell their stock.

(11) The directors who agreed in September to rescind the purchase resolution knew that some of the stockholders did not wish to sell their stock, and agreed to rescind for the benefit of the stockholders who did desire to sell.

Appellants, having been denied a recovery in the trial court, present 104 points of error. In view of what we conceive to be the controlling issues in the case and the proper rulings with respect thereto, we shall not discuss, at least in detail, a good many of the contentions that are made by the parties in their 500 pages of printed briefs, although we have carefully considered all of them.

It is a familiar rule of equity that a constructive trust may be impressed on property which has been bought by an agent who should have bought the property for his principal. The rule has often been applied in cases where property has been bought by an officer or director of a corporation.

A constructive trust does not depend on an enforceable agreement to hold property as a trustee, but in the usual case is impressed against the will of the person sought to be held as a trustee. It is a device employed by the courts of equity to get at a wrongdoer. The suit to have such a trust declared is essentially an equitable proceeding. Its purpose is to provide relief against one who "by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy." 54 Am.Jur., page 167.

It is not the strict letter of the law that will determine the rights of the parties. If it were so, the plaintiffs could not recover here because they have neither a conveyance good at law nor an enforceable contract for a conveyance. The conduct of the parties, both plaintiffs and defendants, is to be measured by equitable standards. Integrity and fidelity, fair dealing and good faith, these rather than strict legal obligations, will establish the basis on which the case must be decided. Kinzbach Tool Co., Inc., v. Corbett-Wallace Corporation, 138 Tex. 565, 160 S.W.2d 509.

Appellants argue much about the fact that there was no rescission of the August 29th action of the board in a subsequent board meeting. They discuss at great length the rules pertaining to agreements between officers and directors and the corporations they serve. They say that there was no valid agreement on the part of the corporation to surrender or transfer to Cox its prior right to purchase the lease. They say that the directors had no authority to act to the detriment of the corporation by abandoning a purchase that would have been beneficial to the corporation. They suggest bad faith on the part of Thomas and the directors in wilfully giving up an opportunity to make a profitable deal for the corporation in order that some of the stockholders might sell their stock. They argue with great insistence that the evidence shows without dispute that there was neither a rescission of the purchase resolution, nor acquiescence in the abandonment of the purchase, nor ratification of Cox's purchase, by a majority of directors familiar with all the facts.

Much of plaintiffs' argument appears to be based on the thought that a trust must be declared unless defendants show a valid, enforceable contract between Cox and the company for a conveyance or release of the company's rights in the lease, and that in determining whether

or not there was a valid agreement between the company and Cox, a director, we must apply the general rules of corporation law pertaining to contracts and conveyances between a corporation and one of its directors. The outcome of the suit depends neither on there being a valid agreement on Cox's part to acquire title and hold it for the corporation, nor on a valid agreement on the part of the corporation to transfer title to Cox. There was no valid agreement of either kind in this case. In fact, there was no agreement, valid or invalid, of such nature. We are not called on to determine the validity of an agreement between Cox and the corporation, but to determine whether there has been on Cox's part such a breach of fidelity to the corporation, measured by equitable standards and not in terms of legal obligations, as would render it inequitable for defendants to hold and enjoy the property, and likewise to determine whether there has been such conduct on the part of the corporation, also to be measured by equitable standards and not in terms of legal obligations, as would render it inequitable for plaintiffs to have and enjoy the property. The general burden of proving a case is on the plaintiffs. The general rule also is that the proof relied on to establish the trust must be clear and satisfactory. 54 Am.Jur., pp. 465–466.

We will measure neither the acts of the defendants nor those of the plaintiffs by the strict letter of the law, because, as we have said, to do so would usually defeat any effort to erect a constructive trust. At law, as distinguished from equity, the corporation had no prior right; it had no title or interest of any kind, in the Wilson lease simply by virtue of the passage of a resolution authorizing its purchase. To have acquired title or an interest under the law, the corporation would have to have followed the action of its directors by paying the purchase price and obtaining a conveyance, or entering into a valid contract to convey with the owner of the lease. If the plaintiffs resort to the remedies of equity to assert a right they could not assert under the law, than their own actions must be measured

by equitable standards. They may not be relieved of the effect of the strict letter of the law in order to invoke equitable remedies against the defendants, and yet take cover under the strict letter of the law when their own acts are measured by equitable standards.

Neither formal action of the directors, nor knowledge by them that Cox was going to buy the lease if the company did not, nor anything other than mere inaction, was required on the part of the company to abandon the purchase of the lease. All that the company had to do not to get the lease was simply to fail to follow through by paying the purchase price and obtaining a conveyance. The evidence indicates, and common knowledge would tell us the same thing, that in view of developments in the areas near this lease prompt action would have been necessary to acquire the lease from the owner at the price at which it was then available.

Appellants appear to feel that the evidence shows that Thomas and Cox must have planned to divert the purchase from the company to Cox in order that they might make a private profit out of the deal, and they lay especial emphasis on the fact that in the latter part of October a half interest in the lease was transferred to Thomas' two children. No issues were submitted to the jury concerning any such plan or conspiracy, and the record does not justify a holding that the undisputed evidence shows such facts as a matter of law.

In some circumstances concealment of actions may constitute a badge of fraud. Here, however, there is ample evidence to show that Cox concealed his purchase from no one. The findings of the jury are that a majority of both the old and the new boards knew about it. Cox told Eddleman about the lease even before he brought it to the attention of the directors, and asked Eddleman if he thought it would be a good buy. Later he told Eddleman that he had bought the lease himself. Eddleman testified that "everybody" in Wichita Falls knew that Cox had acquired the lease and was drilling

on it. In this connection it might be mentioned that Eddleman had had many years' experience in the oil business, and had practiced law for several years before he entered the oil business, and had long been acquainted with Thomas, Cox, and the Deep Oil Development Company. Cox continued to serve as a director of the company after the stock purchase by Eddleman, assisted the new superintendent of production in his duties, and, after he began drilling on the lease, frequently told the new superintendent about the progress on the well. It is true that Eddleman testified that he did not know of the August 29th action of the directors until about the time the well was finished, but there is nothing to show that Cox concealed any of the facts, and the jury found, as above shown, that Eddleman knew about the matter on November 20th, which was the day the directors held a meeting, Eddleman was elected president, and the minutes of the August 29th meeting were read. The jury may have given weight to the fact that the exhaustive investigation of the books, records, properties and business of the company which Eddleman had made before he bought the stock included an examination by an attorney of the minute book of the company.

■ The failure of the company to acquire this lease, as we interpret the evidence in the light of the findings of the jury, was not due to Cox's purchase of it, but was due to the fact that Thomas, the president and general manager, and a majority of the directors, even though they acted individually and not in a meeting, decided to and did abandon the purchase. There was not another board meeting until November 20th, and there is no evidence showing any effort on the part of the directors or any of them to follow up the action taken on August 29th, there is no suggestion of anything done to override the decision which Thomas had announced not to buy the lease, and the evidence supports the conclusion that a majority of the directors, together with the president and general manager of the company, intended to abandon the purchase, knew that the purchase had been abandoned, and knew that

Cox had purchased the lease after the company had failed to go through with the purchase.

So long as the company desired to acquire the lease, it was Cox's duty under the circumstances not to do anything to frustrate that desire. But the evidence is sufficient to show that he discharged with fidelity every obligation he owed the company, and that it was only after it reasonably appeared to him that the company was not going to buy the lease that he acquired it for himself. The language of the opinion in Green v. Hall, Tex.Com. App., 228 S.W. 183, 185, where the court refused to impress a constructive trust, is somewhat applicable to the facts of the case before us: "Because he was director and general manager, the law did not impose upon him the burden to personally undertake to carry out the contract of the company, but only demanded that he exercise ordinary care, and in good faith attempt to carry out the duties imposed by the trust. This the jury found that he did, and after the company's failure, nothing prevented him from leasing the land."

■ The findings of the jury are to effect that the new directors, including Eddleman, who had acquired 92 per cent of the stock, learned of the material facts, but laid claim to the lease only after it was seen that Cox's well was a producer. Appellants argue that the officers had no lawful right to waive claim to a valuable piece of property, that they could not acquiesce in the alleged fraud except with full knowledge of all the facts, and not then to the detriment of the corporation, and that they could not, under the circumstances, lawfully agree that Cox should have a valuable lease that rightfully belonged to the corporation. Again it must be remembered that neither the plaintiffs nor the defendants are relying on valid legal obligations. The question is whether the facts and circumstances require that legal rights and titles be disregarded in order that justice may be done. The company, in the instant case, could have acted only through its officers, directors, and agents. Its conduct, like that of the defendants, must be measured by equitable standards, and not in

terms of legal obligations that could be enforced in court at law, and the conduct which we necessarily have to consider is the conduct of those persons who had the right to and did represent the corporation in carrying on its business and affairs.

In Russell v. Republic Production Co., 5 Cir., 112 F.2d 663, 666, a case cited by appellants, a trust was declared, but the court declared that the one seeking to impose the trust, "if it knew of these dealings, ought promptly to have elected whether to claim and pay for the purchases or waive its rights." As authority for its declaration the court cited Hoyt v. Latham, 143 U.S. 553, 12 S.Ct. 568, 36 L.Ed. 259, where it was said that under the circumstances of the case the plaintiffs were fully informed of the facts or at least were informed enough to put upon them the necessity for further inquiry, and that they should have taken immediate action to claim the property. It was said that the evidence showed on the part of plaintiffs a desire to wait and see whether the transaction in question would prove to be a successful speculation.

■ In deciding whether or not a trust should be constructed, we are limited to the facts found by the jury and such other facts as were established by undisputed evidence. Such facts, in our opinion, do not provide a sufficient basis for the construction of a trust. We do not find such wrongdoing on the part of Cox or on the part of Thomas' two children as would warrant a holding that it would be inequitable, or against good conscience, for them to hold and enjoy the property. It is further our opinion that the conduct of the plaintiffs and those who preceded them in interest was such as to bar them from the recovery sought in this suit. In our opinion it would be inequitable and against good conscience for the plaintiffs, in the face of facts found by the jury, to have and enjoy this property, in the purchase and development of which they risked nothing, and which they came forward to claim only after it was proven to be oil-producing.

Judgment of the trial court is affirmed.

HALL, Justice (dissenting).

In 1937 the Deep Oil Development Company reorganized and secured a charter from the State of Texas covering one million dollars capital stock, divided into 40,000 shares. On November 20 of the same year the stock was increased by stock dividend to two million dollars. On April 4, 1938, the Company increased its shares to 400,000 at a par value of $5.00 per share. The corporation was formed for the purpose of buying, selling, storing and transporting oil, gas, salt brine and other mineral solutions, to own pipe lines and all other general equipment necessary to operate producing oil wells. The term of the charter was to run for fifty years. A portion of Section 5 of Article V of the charter is as follows: "The president shall be the chief executive officer of the corporation; he shall preside at all meetings of the stockholders and directors; he shall have general and active management of the business of the corporation, and shall see that all orders and resolutions of the board are carried into effect." Some time in 1947 (date not given) the following is found in the minutes: "The president, Mr. John W. Thomas, made his annual report and presented financial statements which disclosed the condition of the company as at December 31, 1946. The total gross income for the year was $571,734.11, with total net barrels produced 330,952, selling for $488,862.00. Mr. Thomas also stated that the company is in excellent financial condition. We owe no money, have over $100,000.00 in the bank, and it shall be our aim to pay maximum dividends consistent with good business practice." The record shows the Company was receiving a monthly income of $50,000 in August, 1947.

On June 1, 1947, President Thomas was receiving a salary from the Company of $825.00 per month, and L. F. Cox was receiving a salary of $700.00 per month. These salaries continued until the corporation was dissolved.

On August 29, 1947, the following resolution was passed:

"* * * The minutes of the meeting held June 4, 1947 were read and approved.

"On motion duly seconded and by the affirmative vote of all the directors present, L. F. Cox was authorized to negotiate with L. W. McCrory, Trustee, regarding the purchase of 80 acres in Block 71, American Tribune New Colony Subdivision, Archer County, Texas, on the basis of $150.00 per acre cash and $250.00 per acre out of 1/8th of the oil."

This resolution is the basis for this lawsuit, because instead of the above resolution having been carried out by the president, he had the lease purchased in the name of and by the director Cox. This, in the writer's opinion, could be no less than a constructive trust. It becomes immaterial, in the eyes of the law, why Thomas directed Cox to buy the lease personally so long as it was beneficial to the Company that the order of the Company be carried out. The jury found that all of the directors who voted to pass the resolution knew at the time they voted for it that the lease would have been beneficial to the Company and knew at the time Thomas talked to them privately and persuaded them not to go through with the lease that it would have been beneficial to the Company to have bought the lease. Thomas testified to that effect and so did Cox.

The only reason given why the Company did not purchase this lease is that Thomas had made commitments to prospective purchasers, back in May, that he would leave the property in status quo, and that he did not wish therefore to materially change the status of the corporate assets. No resolution had been passed concerning such reason advanced by Thomas and there had been no stockholders' meeting wherein Thomas had been ordered to sell the Company, as provided under sections 3 and 4 of Article 1387, Vernon's Anno.Civ.St., wherein it is necessary that four-fifths of the stockholders shall consent in writing before dissolution may be had, and section 4, "When, without a stockholders' meeting, all the stockholders of the corporation consent in writing to a dissolution, the same shall be certified to as above and filed with the Secretary of State. * * *"

Granting that Thomas was sincere in allowing Cox to purchase the lease personally and not allowing the Company to purchase the same, to its damage in the sum of $750,000, the reason given is not sufficient in law to keep a constructive trust from becoming impressed upon the property. Thomas and Cox, not having been instructed by the stockholders to perfect a sale of the Company and not having been instructed by all the stockholders, and neither by the directors, that they shall refrain from engaging further in the oil business until they found a purchaser for the Company, and charged with the law that their participation in a known breach of trust involved responsibility on the theory of a constructive trust, 42 Tex.Jur., sec. 51, p. 656, could not be innocent purchasers. Neither are Thomas' children innocent purchasers because our Supreme Court as early as 1887 in the case of Martin et al. v. Robinson et al., 67 Tex. 368, 3 S.W. 550, at page 557, said: "The remedy which equity gives, as has been well said, 'reaches all those who were actually concerned in the fraud, all who directly and knowingly participated in its fruits, and all those who derive title from them voluntarily or with notice.' A court of equity will wrest property fraudulently acquired, not only from the perpetrator of the fraud, but, to use Lord Cottenham's language, from his children and his children's children; or, as elsewhere said, from any persons among whom he may have parceled out the fruits of his fraud." Wellington Oil Co. of Delaware v. Maffi, 136 Tex. 201, 150 S.W. 2d 60.

There is no doubt from the record but that the company would have acquired this lease if it had not been for the adverse action of Thomas and Cox, and the law looks to the act and not to why they say they did it, in order to impress a constructive trust. 42 Tex.Jur., sec. 52, p. 658. Also, "so viewing the transaction, a court of equity is enabled to frustrate fraud and work complete justice, and this is its purpose in raising a trust by construction. As the Supreme Court has pithily said, 'equity turns the fraudulent procurer of the legal title into a trustee, to get at him'

* * *." 42 Tex.Jur., sec. 45, pp. 649-650. Appellants in this case did not have to allege fraud; the law imputes "legal fraud" by impressing the trust.

"The officers of a corporation are both agents and trustees; that is to say, they are agents of the corporation and trustees for the stockholders. Like the agent of an individual principal, officers of a corporation are at least trustees of its property. Both as agents and trustees they are liable for any breach of duty, the principles governing their liability being those of the law of trusts." 11 Tex.Jur., sec. 372, p. 21.

"It is a cardinal principle that an officer of a corporation will not be permitted to make a profit out of his official position, but must give to the corporation the benefit of any advantage which he has thereby obtained. * * * The rule is that, in addition to being authorized by disinterested directors, a transaction between an officer and a corporation will not be allowed to stand unless it be fair and reasonable to the corporation and its stockholders." 11 Tex.Jur., sec. 373, pp. 23-24.

The trial court submitted this case to the jury evidently upon the theory of agency, and, as I view the majority opinion, it upholds contention of the trial court that Cox was merely an agent for the Company, to-wit, a broker who was trying to sell the lease to it, and when he was told by the president of the Company it would not buy the lease he would be justified in purchasing it himself, but such is not the fact in this case.

In conformity with the principle that officers of a corporation are trustees of its property, when an officer purchases a piece of property anticipated to be purchased by the Company, the courts will impress a trust upon the property where the bargain made is unfair to the Company; but let us review the facts pertaining to Thomas in diverting this sale on account of the fact that it was made the same year he had agreed not to change the status of the corporation. He told Cox on the 2nd of September, 1947, not to buy this lease for the reasons given, and we find on September 4, two days later, he disposed of a Clay County lease for the sum of $1,045.00. We find on June 4, a few days after the month of May when he made this commitment to the prospective purchasers, that he allowed the Company to drill a well, which was not an offset, at an expense of between $18,000 and $20,000 to the Company; that he bought a lease for the sum of $3,812.50 and bought another lease which cost the Company three-eighths of $15,000 during the interim.

It was pretty well known by September 2 that Eddleman was the best prospective purchaser, for Cox met him on the street and suggested that he was going to submit a lease to the Company for purchase. Eddleman was in Wichita Falls when Thomas and Cox decided that Cox should buy the lease, and if they were afraid it might frustrate the sale, it would have been easy to have called Eddleman to see if it would frustrate the sale. However, if Eddleman and all other prospective purchasers would have told Thomas, Cox and all other directors that they would not buy their stock if this lease was bought by the Company, Cox would still hold the lease in trust for the Company because it was to the advantage of the Company that this lease be purchased. If a constructive trust will not be impressed on such a transaction, then all corporations in the State of Texas will be run at the mercy of the directors in diverting proposed purchases to themselves individually. Cox and Thomas were each charged with notice of the law that the act of diverting this lease to them was on an illegal and unfounded basis.

I keep connecting Thomas with Cox because the record shows that Thomas' wife and children were substantial stockholders in the Cox Drilling Company, of which Cox is president and manager, and the record further reflects that Thomas' children own one-half interest in this lease. Now let us see how that came about. On the date Thomas returned from his vacation, to-wit, September 2, Thomas told Cox he could not buy the lease for the reason given, but asked Cox to buy the lease, wherein Cox agreed to buy it by using Thomas' money. Later Thomas told director Coffey to take his (Thomas') check

for $12,000 to the lessor, Luke McCrory, and to tell him it would be all right to cash it but that he, Thomas, did not know to whom the lease was to be made and would give him that information later. Coffey did deliver the message and the check to lessor McCrory. The fact that Thomas did not know to whom the lease was to be made out might indicate that it would be placed in some one's name in trust to hold for the Company in case the sales did not go through, because he already had an agreement with Cox that Cox was to do the purchasing. Now after Thomas had invested $12,000 in the project and about the time it was definitely determined that Eddleman was contracting to purchase the stock, to-wit, sometime in October, here is the way Thomas' children came into the picture. Cox tells Thomas that he is discouraged in the lease, he doubts if it will produce. Upon such information, however, Thomas decides to allow his children to buy a half interest in it. Thomas at this time and at the time of trial still held Cox's note without any payment having been made upon it. Now instead of Thomas giving Cox credit for $6,000 on his note for a half interest in the project, he allows his children to each give Cox a check for $3,000 for one-half interest in the property. This makes a total of $18,000 which Thomas and his family have advanced to the project.

Now on November 20, 1947, there was a "special meeting of the Board of Directors of the Deep Oil Development Company" held in the office of the company at 3:30 P. M. This was a meeting where some of the witnesses say that the resolution of August 29, supra, was read and that Eddleman and Les Humphreys both were present when it was read. The reading of this resolution does not impute to them that this same lease so described had been diverted into the name of Cox and the children of Thomas. It does not in any way connect up with the lease which Cox later began to drill and the one in which the description was read. It is noted that the Wilson land covers considerable acreage; the resolution covers about one minute's reading time. There is nothing in the minutes, as there was in previous minutes, substantially as follows: "The minutes of the meeting held on ———— were read and approved." This special meeting of the board was called, however, for the purpose of selling stock to Eddleman. All of the minutes pertained to the sale of stock, the reorganization of the company, selecting new directors, etc.

The minutes of the company indicate that the meeting on November 25 was directed to the same purposes. There is nothing in the minutes nor in the testimony that indicates any discussion was made about this lease or any other piece of property belonging to the company at the meetings held on November 20 and November 25.

On November 30 another meeting was held by the new board which confirmed what had been done at the previous two meetings. These three meetings placed Eddleman and his new directors in charge of the assets of the Company. We can readily see that they were busy acquainting themselves with such wide and varied businesses the Company had, to-wit, over thirty producing oil leases scattered over several counties producing 800 barrels daily and over thirty non-producing oil leases scattered over several counties. So in the midst of all this turmoil, while Eddleman and his associates were busy acquainting themselves with the affairs of the Company, Cox and Thomas move out on this lease on December 3, the last meeting having been held on November 30. They start drilling on December 7 and in thirteen days they have them an oil well. The jury found, the court rendered judgment upon their findings and the majority opinion of this court has approved such findings and such judgment, that because Eddleman was present when the resolution dated August 29, 1947 was read on November 20, 1947, that Eddleman with such knowledge failed to notify the defendants of any claims the plaintiffs might have within a reasonable time under all the facts known to him at that time, and that E. H. Eddleman and his agents had sufficient knowledge of the facts which would have put an ordinarily prudent person on inquiry, which, if pursued, with reasonable dili-

gence, would have disclosed at the time he bought the stock of the Company that the old directors had passed the resolution of August 29, 1947.

As I see it by a reading of the minutes of August 29, 1947, which merely ordered the directors to buy a lease by legal description, it would not impute anything to a person who was listening except that it might bring to his mind that a lease had been ordered purchased and that officers of the Company may have carried out such orders of the directors, as, according to law, they should do, and/or they did all they could do to carry them out. In other words, it would impute to an unbiased person, who had no occasion to suspicion any adverse action from any of the directors, that if the lease had not been purchased and the lease was not in the process of being purchased by legal examination of the title, etc., that it would be only another lease which they attempted to buy, but there is nothing in the reading of these minutes which would bring to the mind of anyone that that particular lease which was ordered purchased by the Company had been illegally diverted to and had been bought by two of its directors; and that it was to the best interest of the Company that it purchase the lease.

The law does not place the burden upon Eddleman to immediately trace down the title to this lease or any other piece of property which he was buying or had the right to buy from the Company, he not having been put on notice that a wrong had been perpetrated against the Company. He had a right under the law to assume that everything had been done that could be done to purchase this lease. The law, however, places the burden upon Cox and Thomas, who had illegally diverted the purchase of this property from the Company and into their hands, to give full disclosure to the stockholders of their acts. They both testified they were present and heard the minutes read pertaining to the resolution of August 29 but neither said a word, and under the law it was their duty to explain to all who were there, as well as to all stockholders, that instead of the Company purchasing this lease that they

themselves had purchased the same in the name of Cox with the use of Thomas' money, that it was advantageous at the time that they did so for the Company to have purchased the same, that it was still advantageous to the Company that it purchase the same, that the reason why the Company had not purchased the same was because some of the directors wanted to sell their stock and thought it might frustrate the sale, and since there were some of the directors who were not present at the time the order was given and were not a party to the refusal of the company to purchase the lease, and since the purchaser of said stock was present, that if they then desired to look into the matter and see if they wanted this lease they would have the privilege to do so but if they did not want the lease then Cox and Thomas did want it as they were expecting to start a well within a few days. Now if Cox and Thomas had fully disclosed the above facts to not only the old directors and the new directors of the Company but to all of the stockholders of the Company, then in that event if the directors and stockholders of the Company allowed him within a reasonable time to expend the money for drilling a well, then in that event they may have waived their right to the lease. But no such "full disclosure of the facts" was ever revealed to Eddleman or to any other stockholder, except Cox, Thomas and Coffey. The record shows the stockholders lived in eleven different states, twenty different counties in the State of Texas and two foreign countries, to-wit, Canada and Cuba. It is the contention of the writer, under the facts in this case, that a director of a corporation cannot legally purchase a piece of property for himself which the corporation has ordered to be purchased unless it be done under the following three conditions:

First, if the corporation were not financially able to purchase the lease at the time. Green v. Hall, Tex.Com.App., 228 S.W. 183.

Second, if the deal were as beneficial to the corporation as it was to Cox for Cox to purchase instead of the corporation. Tenison v. Patton, 95 Tex. 284, 67 S.W. 92.

Third, if Cox had fully disclosed all the facts to all of the stockholders and they had acquiesced therein. Zorn v. Brooks, 125 Tex. 614, 83 S.W.2d 949.

The facts may show that Eddleman knew that Cox had bought the lease which Cox had talked to him about submitting to the Company, but there is no evidence imputing to Eddleman that the directors had ordered this same lease to be purchased for the Company and that Cox and Thomas had diverted the lease to them instead. This is the missing link that appellees "failed to give full disclosure of the facts to Eddleman." However, if Eddleman and all of the other directors had known the full facts in the case but did nothing about it for the benefit of the stockholders in order that they might carry out their sale and purchase of stock, still Cox would have purchased this lease in trust for the stockholders because it is not the law in this state that a prospective purchaser and the directors of a company can cause the company to lose $750,000 because a purchaser wants to buy some of the stock owned by some of the directors who want to sell. Appellees argue they had a right to go out of the oil business and to sell their stock. No one questions such a right; but while doing so they cannot, while a director, injure the corporation materially and reap the benefit of such injury. See Tobin Canning Co. v. Fraser, 81 Tex. 407, 17 S.W. 25; Zorn v. Brooks, supra; Scott v. Farmers' & Merchants' Nat. Bank, 97 Tex. 31, 75 S.W. 7, 104 Am.St. Rep. 835; Canadian Country Club v. Johnson, Tex.Civ.App., 176 S.W. 835, error refused; Aransas Pass Harbor Co. v. Manning, 94 Tex. 558, 63 S.W. 627; Hildebrand Texas Corp., Vol. 3, sec. 700, p. 70; Moore v. Waco Building Association, 19 Tex.Civ. App. 68, 45 S.W. 974, error refused; Fletcher Cyclopedia Corporations, Vol. 2, sec. 760, pp. 791–793; Commercial & Agricultural Bank v. Jones, 18 Tex. 811; 19 C. J. S., Corporations, § 768, pages 126–127; Edwards v. Strong, Tex.Civ.App., 207 S.W.2d 655, reformed and affirmed Tex.Sup., 213 S.W.2d 979.

So, the diversion of a lease from the corporation to one or more of the directors is invalid when such action is contrary to the interest of the corporation. It has already been discussed that appellees could not have been innocent purchasers of this lease under the facts. Their defense in order to be released from the constructive trust is by and through the actions of Thomas in persuading some of the directors individually (and not at a directors' meeting) to say that they would rescind the resolution of August 29, 1947. Of course such personal action of a director would not bind the company and would be of no force and effect under the law. Appellees cite the correct law pertaining to a directors' meeting and its importance in Hildebrand on Texas Corporations, Vol. 2, p. 575, secs. 637–638, wherein it is stated, among other things as follows: "The power invested in the Directors to control the management of the corporation is not a joint and several, but joint only. Therefore, when the Directors purport to act for the corporation, they must be assembled as a Board. They cannot act and give their consent separately and bind the corporation. Not only must the Directors act together as a body, but as a general rule, they must be assembled at a formal and legal meeting and not at a casual or informal meeting. The reason for this requirement is that each Director should have an opportunity to discuss fully all matters that come before the Board. Very often a strong Director by a full and frank discussion of the pending question may be able to convince some of the other Directors that their conclusions formed before the meeting are erroneous." But even if their actions could be construed as a legal directors' meeting while saying that they would rescind such resolution, such action would be of no force and effect for at the same time they all admit that it would have been beneficial to the Company to purchase the lease and that they (except Coffey) did not know that Thomas was assisting Cox in buying the lease. But I find there were not four disinterested directors who agreed to rescind the resolution of August 29. In the first place Thomas was an interested party and his vote would be of no avail. In fact all of them were interested parties in view of the fact that their action was a selfish interest,

to-wit, to sell their stock. We have now disposed of Thomas; now we shall take the others.

Director W. H. Taylor was not present on August 29 and was not consulted later by Thomas to rescind.

Director Les Humphreys was found by the jury to not have given his consent to rescind said resolution.

Director Cox was recipient of the result of said rescission and of course his consent would not count.

Director John Loggie told Thomas he would rescind upon the following conditions found by the jury, to-wit: that if the sale of the stock did not go through that Cox would let the Company have the lease or part of it back. Such attempted rescission being based upon a condition his consent would not count.

Director Gutzman consented to rescind the lease individually and not in a directors' meeting but he did not know at such time that Cox was to purchase the lease nor that Thomas was paying for the lease.

Director John C. Coffey was the only one of the directors who knew all the facts and he agreed individually to rescind the resolution.

So it is readily seen from the facts in the case that there was no legal rescission and even if there were, it would not keep the constructive trust from being impressed.

The only testimony I can find in the record that directly called Eddleman's attention to the fact that the lease which Cox owned was the same lease which the Company ordered Cox to buy happened about the middle of December, according to Coffey, wherein Coffey testified in said conversation that Eddleman suggested they not say anything about it until they were satisfied by an investigation because he did not want to cast any reflections unless it was proved they were justified. The testimony further shows that immediately thereafter an investigator was employed to ascertain the facts. This, in the writer's opinion, does not show acquiescence but it merely shows good judgment on the part of Eddleman because no business man desires to cloud the title to land where there is a drilling oil well unless he knows where he stands. The middle of December would be about the 15th; the well was completed on the 20th.

The evidence is insufficient to connect the new director Gay with the facts in the case that Cox had purchased the lease which he had been ordered to purchase for the Company, because he did not come to Wichita Falls until the 25th of November, 1947.

The new director Ford was not sufficiently notified of all the facts in the case when he became a director on November 25, 1947. He had never lived in the area before and was not familiar with the properties of the Deep Oil Company. Even though he was out on this lease a time or two while the well was being drilled by Cox, yet he had not been informed by Cox that the lease which he was drilling was the one which the Company had ordered him to buy for the Company. Ford was watching the developments of the Cox well because the Company had an adjoining lease. However, if they had known the facts, laches would not attach as to all other stockholders until the other stockholders had been notified of all the facts and had failed to act in their own behalf.

Another peculiar thing about this lease is that Cox did not file the same for record until long after he had brought the well in, same being filed January 19, 1948. Neither did the Thomas children file their assignment until the same date.

I do not believe under the following authorities and other cases which I have read that laches or estoppel prevents appellants from recovering this lease, to-wit: Culver v. Pickens, 142 Tex. 87, 176 S.W.2d 167; Humble Oil & Refining Co. v. Trapp, Tex. Civ.App., 194 S.W.2d 781, error refused; Richey v. Miller, 142 Tex. 274, 177 S.W.2d 255, 170 A.L.R. 832; Burleson v. Burleson, 28 Tex. 383; Wright v. Bonta, 19 Tex. 385; McLaren v. Jones, 89 Tex. 131, 33 S.W. 849; Williams v. Texas Employers Ins. Association, Tex.Civ.App., 135 S.W.2d 262, error refused; Railroad Commission v. Shell Oil Co., Tex.Civ.App., 170 S.W.2d 568; Krohn v. Williamson, C.C., 62 F. 869.

There could be no effective acquiescence or ratification of this lease by the appellants unless they had knowledge of the material facts. There is testimony from at least one stockholder who was not an officer or director of the Company to the effect that he did not know of such facts, and it is not contended by appellees that all of the stockholders knew the facts. Great Atlantic & Pacific Tea Co. v. Athens Lodge, Tex.Civ.App., 207 S.W.2d 217, error refused, N. R. E.; City of Laredo v. Macdonnell, 52 Tex. 511; Harris Millinery Co. v. Bryan, 59 Tex.Civ.App. 477, 125 S.W. 999; Reese v. Medlock, 27 Tex. 120, 84 Am.Dec. 611; Devoe & Raynolds Co., Inc., v. John P. Steger Lumber Co., Tex.Civ.App., 9 S.W. 2d 277; Allison v. Harrison, 137 Tex. 582, 156 S.W.2d 137; Zorn v. Brooks, supra.

I disagree with the majority opinion which holds that the corporation did not have a prior right to this lease. The facts show that on August 21 the Company had some $227,000 in the bank and on August 29 the directors ordered Cox to buy this lease. That Cox in turn informed the landowner that they would accept the lease at the stipulated price per acre of $150 in cash and $250 in oil, which the landowner agreed to accept. I disagree with the holding wherein it states, to-wit: "To have acquired title or an interest under the law, the corporation would have to have followed the action of its directors by paying the purchase price and obtaining a conveyance, or entering into a valid contract to convey with the owner of the lease." My contention is that the corporation did acquire title to this lease by the action of Cox in purchasing it, that even though he did not intend to purchase it for the Company, yet the law says that he did by impressing a constructive trust thereon. It is not a matter of taking this lease away from Cox because the law does not take away from those who do not own. Neither is it a question of appellants' standing by and waiting to see if the oil lease would produce as though it was a wildcat lease. The record shows that the lease was an offset to a producing well which had 75 feet of rich sand in the lower strata and 25 feet of rich sand in the upper strata. In other words, it was practically the same as a proven lease when appellees started drilling their first well. My thorough conviction is that there was no ratification on the part of any of the appellants of Cox's action in purchasing this lease for himself; neither are there any legal grounds for estoppel or laches which would prevent them from recovering the same.

The discussions appearing in this dissent are raised by appellants' points of error. There are many errors that are sufficient to remand this case but I will not point them out in this dissent, since I am of the thorough conviction that the same should be reversed and rendered with instructions to the lower court for appellants to pay appellees the purchase price of the lease, for all sums of money they have reasonably expended while drilling and equipping the wells thereon and operating the lease, less the price of the oil runs which have been recovered by appellees from said lease; there seems to be a stipulation in the record pertaining to this matter and it will be easy for the court to ascertain the true facts from bank records, pipe line runs, etc.

For the reasons above stated, this dissent is entered.